## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

### PURYEAR v. THE COMMONWEALTH.

MARCH 24th, 1887.

*Absent*—LEWIS, P.

1. CRIMINAL PROCEEDINGS—*Prejudice—Jury.*—Court may properly refuse to summon jury from another county because of local prejudice, until effort to obtain impartial jury has failed.
2. IDEM—*Evidence—Res Gestæ—Dying Declarations—Presence.*—Statement of deceased *in articulo mortis*, and in presence of accused, that accused killed her with poison in whisky given shortly previous, is admissible as part of *res gestæ*,—as dying declaration,—and as statement in presence of accused undenied by him.
3. IDEM—*Note of Accused—Matter of Defense.*—Note written by deceased indicating intention to take her own life, with endorsement by officer when found, is not admissible on cross-examination of Commonwealth's witness who could not prove the hand-writing, but as matter of defense.
4. IDEM—*Indictment—Certainty—Case at Bar.*—Under Code 1873, ch. 201, § 12, the indictment here charges the offense with sufficient certainty.
5. IDEM—*Jurors—Objections.*—Under Code 1873, ch. 158, § 20, objection to juror for a disability created by the constitution, comes too late after verdict. *Poindexter's Case*, 33 Gratt. 791.
6. IDEM—*Felony—Pardon.*—Where in 1868, juror, convicted of felony, had been pardoned, motion for arrest of judgment does not lie. *Edward's Case*, 78 Va. 43.
7. IDEM—*New Trial—Case at Bar.*—The evidence in this case warrants the verdict of guilty of murder in the first degree.

Error to judgment of circuit court of Prince George county, rendered May 22, 1886, sentencing Holmes R. Puryear, whom a jury had found guilty on an indictment for the murder, in the first degree, of his wife, Emma L. Pur-

·year, to be hanged by the neck until dead.   From this judgment, upon exceptions to various rulings of the trial court, prisoner obtained from one of the judges of this court ·a writ of error and *supersedeas*.   Opinion states the case.

*R. T. Wilson* and *V. W. Keeler*, for the plaintiff in error.

*R. A. Ayers*; Attorney-General, *R. H. Jones*, and *Edmund Pendleton*, for the Commonwealth.

LACY, J., delivered the opinion of the court.

The indictment was for murder by poison, and was found in the county court of Dinwiddie county.   When arraigned in that court, the plaintiff in error demanded, as his right was, to be tried in the circuit court of that county, and the case was accordingly so removed to the circuit court of Dinwiddie county.   In that court he moved the court to cause a *venire* to be summoned from another county to try his case, because of the prejudice existing against him in that county.   This the circuit court refused to do until the effort had been made to obtain a jury, from the *venire* already summoned, free from exceptions.   Subsequently, it appearing that an impartial jury could not be obtained from Dinwiddie county to try the case, upon the motion of ·· the plaintiff in error the case was removed to the county of Prince George, where a jury was obtained, and the case proceeded to a trial.   The jury found the plaintiff in error guilty of murder in the first degree, and he was sentenced to be hanged.   From this judgment and sentence he obtained a writ of error to this court.   There were numerous exceptions taken at the trial to the ruling of the court below, which are assigned as error here, which will be considered in their order; postponing the fourth to the others, however.

The first is for the refusal of the circuit court to have a jury summoned from another county to try the case because of prejudice against him in Dinwiddie county. Whenever an impartial jury cannot be obtained in the county where the offense is charged to have been committed, and the court is satisfied, or it is made to appear, that such is the prejudice against the accused that an impartial jury cannot be obtained for the trial of the case in such county, the court must cause a jury to be summoned outside of said county, as every man is entitled to be tried by an impartial jury; and whenever this principle is disregarded the trial is a mockery, and the judgment based thereon will be set aside in this court. But the court did not err in first exhausting all proper endeavors to obtain an impartial jury in that county; for it can only be necessary to summon a jury from another county where the fact appears that justice demands it, and in this case the court refused to make such order only as being premature; and subsequently, the fact appearing, upon the motion of the accused, the case was removed to the county of Prince George, in which a jury was obtained free from exception. When it appeared in the regular way that a jury free from exception could not be obtained readily in Dinwiddie county, the accused did not insist upon his motion to have a jury brought from another county into Dinwiddie county, but himself moved to remove his case for trial to another county, and his motion was sustained by the court. There was no error in this. The end to be obtained was an impartial jury; and this being obtained, the ends of justice were obtained.

The second exception is as to the admission by the court of the charge made by the dying woman that her husband had killed her with poison mixed in whisky, and administered to her a short time before. This evidence was admissible upon three grounds: *First.* It was a charge made against her husband in his presence, and not denied by

him, he greeting this terrible arraignment with the exclamation, "Lord! Lord! Lord!" clapping his hands on his head, and leaving the room with precipitation. *Secondly.* It was a circumstance immediately and closely linked to the alleged homicide, and was part of the *res gestæ*, and it was admissible. *Thirdly*, as dying declarations. The woman was in the agonies of a terrible death, such as is caused by strychnine poison, going constantly into spasms, her body being drawn backwards, and her eyes rolling up, and her teeth biting the blood freely from tongue and lips, and, as she returned into lucid moments between these, she would cry out, "Oh, I am bound to die, and I am not prepared;" saying to the by-standers: "My husband put me in this fix; hold me down and let me die; tell everybody my husband did it," etc. I do not think that it can be said that this woman, then in the agonies of death, which quickly followed, can be said to have entertained any hope of recovery. She declared that she was bound to die, as she was, and which she quickly did. This evidence cannot be said to have been improperly admitted.

The third exception is that when the deputy sheriff, a witness for the Commonwealth, was being examined, he testified that he had gone with a man named Nash and another to search the quarters occupied by the deceased; that he was searching in the store-room, and Nash was searching in the room occupied by the deceased, and in which she died; that the said Nash called to him to come to him, and when he came Nash showed him a note, and said, "I expect this is the note old man Puryear is looking for." This witness then said that he took the note, put it in an envelope, sealed it, and endorsed it with the date, and this was the note found in Mrs. Puryear's room; that they had searched there three times before, but that they were searching for poison; that the house was in the possession of the sheriff, but that he did not know that the sheriff

had the keys all the time. The note was handed to him. He identified the endorsation on the envelope and the note, and said: "This is the note found in Mrs. Puryear's bed-room, and the one put in the envelope." This was upon cross-examination. The counsel for the accused then asked him to read the endorsation on the envelope, which is as follows: "1885. *H. M. Fisher, deputy sheriff. Found August* 8, 1885, *by William Nash;*" and the note, which was as follows:

*"june* 12

*"i write this to show you all that my husband sas that he will not live with me so i take my own life. You al made me marry him he due not love me now. So good by mother i never expect to see you any more.*

*"Your daughter,          Emma l puryear."*

The attorney for the Commonwealth objected to the reading of the contents of the endorsement and the note to the jury, and the court sustained the objection, and would not allow them to be read to the jury at this stage of the proceedings, and the accused excepted. This evidence was, in a subsequent part of the trial, admitted in evidence. It was identified by the Commonwealth's witness, and the finding attested; and the weight of the letter would seem to be the same whether offered in evidence then or afterwards. It was matter of defense, and its more appropriate place was during the presentation of the evidence on behalf of the accused, and it does not appear that the Commonwealth's witness could prove the hand-writing, or in anywise connect it with the case, as it appears to have been found in the house where the deceased died months after her death, and after a thorough search had been more than once made of the place. There was no error in this ruling of the court.

The fifth exception is as to the form of the indictment.

There was no demurrer to the indictment, but a motion was made in arrest of judgment because of its supposed insufficiency—*First*, that the quantity of strychnine is not stated; *second,* that it is not alleged that the accused knew that she had any intention of drinking the whisky; *third,* that it is not alleged that he administered the whisky, or that he placed it where she could get it and drink it, either by accident or design; *fourth,* that the indictment does not allege any intent on his part to kill and murder the deceased by mixing strychnine for her use, or any intent thereby to do her any bodily harm.

The indictment charges that he did "feloniously, willfully, and of his malice aforethought, contriving and intending one Emma L. Puryear, with poison, feloniously, willfully, and with his malice aforethought, to kill and murder, on the thirteenth of June, 1885, with force and arms, in the county aforesaid, feloniously, willfully, and of his malice aforethought, did privately and secretly convey into and leave a great quantity of strychnine, being a deadly poison, in the lodging-room of her, the said Emma L. Puryear, in the dwelling-house of her, the said Emma L. Puryear, there situate; and that, contriving and intending, as aforesaid, the same strychnine, with a certain quantity of whisky in the same house then and there being, then and there feloniously, willfully, and of his malice aforethought, did put, mix, and mingle,—he, the said Holmes R. Puryear, then and there well knowing the said strychnine to be a deadly poison; and also that the said whisky with which the said Holmes R. Puryear did so mix and mingle the said strychnine was then and there prepared for the use of the said Emma L. Puryear; and that the said Emma L. Puryear afterwards, to-wit: on the day and year aforesaid, did take, drink, and swallow down a great quantity of the said whisky with which the said strychnine was mixed and mingled by the said Holmes R.

Puryear, as aforesaid,—she, the said Emma L. Puryear, not knowing that there was any strychnine or other poisonous ingredients mixed or mingled with the said whisky, as aforesaid; by means whereof she, the said Emma L. Puryear, then and there became sick and distempered in her body, and the said Emma L. Puryear, of the poison aforesaid, so by her taken, drunk, and swallowed down as aforesaid, and of the sickness occasioned thereby, on the day and year aforesaid, in the county aforesaid, died. And so the jurors aforesaid, upon their oaths aforesaid, do say that he, the said Holmes R. Puryear, in manner and form aforesaid, her, the said Emma L. Puryear, feloniously, willfully, and of his malice aforethought, did poison, kill, and murder, against the peace and dignity of the Commonwealth of Virginia."

This indictment is for laying poison, secretly conveying and placing poison, and is sufficient in form and substance. But there was no demurrer and no motion to quash the indictment, and no objection urged thereto until after verdict. Our statute provides, chapter 201, § 12, Code Va.: " Judgment in any criminal case, after the verdict, shall not be arrested or reversed upon any exception to the indictment or other accusations, if the offense be charged therein with sufficient certainty for judgment to be given thereon according to the very right of the case." It cannot be contended that there is any uncertainty in the charge in this indictment. It charges murder by poison, which, under our statute, is murder in the first degree. There is no uncertainty therein ; and, if the allegations are true, the penalty is death, and the judgment of the circuit court was accordingly rendered according to the very right of the case, when the verdict had ascertained the truth of the charge.

The sixth exception is because the court overruled a motion in arrest of judgment because one of the jury in the case had been convicted of a felony. The juror had been

so convicted, but he had been pardoned by the governor in 1868. This was before the present constitution of this State was adopted. The provision, concerning the removal of political disabilities consequent upon conviction for offenses, to be found in the present constitution (article 4, § 5) was not in the constitution then in force. The power to grant pardons was general and unrestricted as to the offense in question, and the pardon not merely released the offender from the punishment prescribed for the offense, but obliterated, in legal contemplation, the offense itself. In the case of *Edwards* v. *Commonwealth*, Lewis, P., considers this question, and cites the authorities bearing upon the subject, and no further reference to authority is deemed necessary here upon this point. 78 Va. 43. But, were this otherwise, the motion is claimed to have been made too late after verdict. Our statute provides "that no exception shall be allowed against any juror, after he is sworn upon the jury, on account of age, *or other legal disability,* unless by leave of the court," (chapter 158, § 20, Code Va.); and in *Poindexter's Case* this court held that the objection to a juror for a disability created by the constitution came too late after verdict. 33 Gratt. 791. But, in the view we have taken of the effect of the pardon in this case, this question does not arise here.

The seventh bill of exceptions is because the attorney for the Commonwealth, in the argument, referred to the character of the accused. He said " he had known Holmes R. Puryear from his childhood; that he [Puryear] had been to school to him [the attorney] in his boyhood; and that his previous character should ——." Here he was stopped by the court, and not allowed to proceed further. This is no ground for arresting the judgment. The circuit court administered the proper remedy. There was no exception by the accused at the time. Perhaps none was thought necessary. After the action of the court there was nothing

to except to.   See the opinion of Hinton, J., in the case of *Price* v. *Com.*, 77 Va. 393.   Under that decision the exception comes too late after verdict.

Exception four will now be considered, and that is as to the refusal of the court to set aside the verdict and grant the accused a new trial.   The evidence in the case is briefly stated.

That the accused married the deceased in January, 1885. The engagement to marry was for the month of March following.   The marriage was hastened upon the solicitation of the intended wife, who came to the store of the prospective husband, and urged the immediate consummation of the marriage.   This was done in a few days; the intended wife selling her lands for $200, and giving the intended husband the money.   A few weeks after the consummation of the marriage, the wife gave birth to a fully-developed child.   The day of the birth of the child the husband carried the wife to a boarding-house in Petersburg, where the child was born, and there left her, he says, because she gave birth to this child, and he had been deceived about her condition, and that he was not the father of the child.   The town authorities took him in custody on complaint of the wife, and sent him and her back home in charge of an officer.   He would not suffer the child to go with him, and it was given away by the mother to a colored woman.   The husband and wife then lived in a diminutive country store, with a little back room, where the wife slept; and the husband slept under the counter of the store, when he professed to have no intercourse with his wife, and did not allow any others to go in her room except under his supervision.   The evidence shows that he was always unkind and harsh towards his wife, and protested that nothing could make him live with her.   He tried many expedients to rid himself of her by negotiating with her to go to her mother's, then leaving her for days together without his society and with-

out food, which was supplied by some charitable colored people; a young colored woman coming to sleep with his wife in his absence. He came home in the night, and introduced himself in the bed, where he professed never to go, when two women were in it; and the colored woman refused on his account to stay with his wife again when she was alone.

He then changed into an appearance of relenting; had a notion of going back to his wife, he said. Made some promises to her that he would not think less of her; that he would take care of her during her sickness. Introduced some colored persons into her bed-room, and one white man, and, seating himself on her bed, said in a kind way: "Emma, I want you to tell me now, who was the father of that child?" She hid her face in the bed-clothes and cried, and, after coaxing by her sister and him, named another man. He then filed his bill for a divorce, and summoned these very persons as witnesses to prove these admissions thus obtained. The wife employed counsel, and the judge ordered the husband to deposit $50 to pay her costs and expenses in the conduct of the litigation. This money he was not able to raise, and the proceedings were suspended. His conduct now became more violent towards his wife, and she seems to have been in great dread of danger at his hands. When she was found with a knife by a witness, and it was taken from her, he sarcastically took out his own knife, mockingly whetted it on his shoe, and handed it to her to kill herself with.

It is not necessary to detail the long course of these scenes. They came to an abrupt termination in a few weeks. On the thirteenth of June, 1885, about 8 o'clock, he walked leisurely down the road, and called a colored man, who lived a short distance off. He did not come at first, but in a short time he did come; and, as he neared the store, he heard screams of anguish, as if half-smothered,

as if coming from under cover or a close place. The colored man said, " What is this?" referring to these distressing, half-smothered cries. The accused said : " My wife is bad off; go in and see what you can do for her." The witness found the *little room*, eight or ten feet, on this summer day, *shut up close, the window shut, the blind closed, the outer door fastened, and the partition door between the store and this little room fast bolted*, and, upon going in, there lay the wife of the accused apparently in the agonies of death, writhing in pain, screaming as he had never heard mortal scream before, biting her lips and tongue until the blood flowed, and bending her body back in spasms. The spasm passing off, a lucid interval came. During all this the accused appears to have been an unmoved spectator, passing in and out of the room. But his wife, seeing him, charged him with having killed her with a toddy just given her. This he did not deny. Persons began to assemble as the tidings spread, and in the presence of several witnesses he is again and again accused by his wife with her murder. He does not deny it, but puts both hands on his head, and said, "Lord! Lord! Lord!" and goes out of the room precipitately. He then set to work to feign dying agonies himself, had fits very like his wife, jerking and rolling up his eyes, and throwing himself into attitudes, and pretending to know nobody, and, when roused up, drinking an intoxicating drug of some sort marked "bitters." In the last moments of his wife, when relief was coming on in death, two witnesses were in the store with him, and he was *unconscious*, lying on the counter. One witness went into the chamber of the dying woman, and shut the door behind him. The other stayed in the store, so as to watch the accused. All became still in the chamber of death, and perfect stillness reigned in the store. *Thinking himself alone, doubtless, the accused was no longer unconscious, nor in dying agonies, but raised*

*his head cautiously, and, turning his face towards the door* of the now silent chamber, listened *intently.*

There was evidence that early in the morning he said he was mixing a toddy for his wife, and that he had put in the glass white sugar, and a white substance like soda, and, a witness looking into this glass, he stepped up, and took it out of her reach, and placed it where she could not see into it, and he said that he was mixing a toddy; also one for himself. His wife, in her dying moments, charged him with bringing two toddies in,—one for her, which was white, and one for himself, which was red. Two glasses were found in the cupboard, one with a white sediment, the other with red sediment. Both were analyzed by the State chemist. The white sediment contained strychnine, the red sediment contained none. The stomach of the dead woman was taken out, and analyzed also, and strychnine found in it. The doctors proved that the symptoms of the dying woman were indications of strychnine poison. When the death of his wife was at last announced to him, the accused began to make arrangements to bury her at once, sent for persons, wrote an order for a coffin at once, and asked to have the body gotten ready for burial by four o'clock that day. Under these circumstances, the jury, the proper trier of the facts, found him guilty of murder in the first degree.

Upon what principle could the circuit court have disturbed this verdict? It certainly cannot be said to have been without evidence, or plainly against the evidence, and the circuit court did not err in refusing to set aside the verdict, and grant a new trial to the accused.

Upon the whole case, we are of the opinion to affirm the judgment of the circuit court of Prince George county.

JUDGMENT AFFIRMED.