# Richmond.

## D. E. WEBB v. COMMONWEALTH.

March 20, 1930.

Absent, Hudgins, Gregory and Browning, JJ.

The opinion states the case.

*W. G. Vansant* and *Carter & Talbott*, for the plaintiff in error.

*John R. Saunders, Attorney-General, Leon M. Bazile* and *Edwin H. Gibson, Assistant Attorneys-General,* and *James S. Easley* and *Langhorne Jones,* for the Commonwealth.

CAMPBELL, J., delivered the opinion of the court.

D. E. Webb was indicted and tried in the Circuit Court of Pittsylvania county for the murder of Harold Vaden. The jury found him guilty of murder in the second degree, and fixed his punishment at confinement in the penitentiary for ten years, and sentence was pronounced accordingly.

The homicide occurred on February 16, 1928. It appears from the record that the deceased, a young man thirty-three years of age, six feet, two or three inches tall and weighing approximately one hundred and seventy pounds, was, at the time of the homicide, a resident of the village of Gretna. He and his wife lived in the neighborhood where the accused resided. Deceased was jealous of his wife, and at the time of the homicide was separated from her, the clear inference from the following facts and circumstances being that accused was the cause of the separation: Sometime during the month of August, 1927, accused and Mrs. Vaden were seen together, by Arthur Oakes, on the highway some distance from Gretna. Accused told Oakes that his automobile was broken down; that the woman was a Mrs. Smith, a relative of his wife; that he wanted to get her to Chatham to meet her

husband; and that he paid Oakes three dollars to take Mrs. Vaden to Chatham. Accused admitted, when examined as a witness, that the woman referred to by Oakes was Mrs. Vaden, but denied any improper relations between them, and accounted for their being together as the result of an accidental meeting. In some manner not disclosed by the record, deceased heard of this incident. He confronted Oakes with Mrs. Vaden, and Oakes denied that she was the woman he saw with accused, giving as his reason for such denial: "I didn't want him to kill her right there at my home."

Two days after the highway occurrence Mrs. Vaden sent accused a note informing him that deceased did not know that she had gone to a dance on the August night in question. In possession of this information, accused, when interviewed by deceased in November, 1929, as to the whereabouts of his wife, denied having seen her on the day fixed by Oakes, in "order to shield her." In the meantime, accused had an interview with Oakes, who testified in regard to it as follows:

"I had information that Mr. Webb wished to see me, and I realized the position I was in and went over to Gretna to see him. He and myself had a conversation while in Gretna and he asked me to keep my mouth shut about seeing him and Mrs. Harold Vaden up the Martinsville road, and he said that Harold Vaden was a Ku Klux and that he could have every Ku Klux between my home and Lynchburg on him and myself if he found it out, and I told him it looked like it would do all parties good and would certainly please me to keep my mouth shut, and I would be glad to do it, and while I was there he said to me: 'As soon as Harold knows I am hauling his wife around I am going to have him to kill.' I said: 'Mr. Webb, if you

have any such thought as doing that thing don't be preaching it to me,' and I advised him to let Harold alone and change his ways of doing. He said Mrs. Vaden was as nice a woman as he knew and told me how they were thrown together; said he went to Henry county to sell an automobile and just got with Mrs. Vaden while up there; that she was a perfect lady and for me to keep my mouth shut. I told him I would be glad to."

The strained relations between deceased and his wife continued, and on January 22, 1928, deceased, in company with his brother, went to the railroad station where accused was employed as telegraph operator. Giles Vaden thus details what occurred at this interview:

"We went in and Harold said: 'Mr. Webb, I came down here to see you and have you explain to us where you were on that Tuesday (I think it was Tuesday) night in August.' He said: 'I spoke to you once before about it and asked you who the woman was with you on the Martinsville road broken down and you told me Mrs. Smith; that your wife was a Miss Smith and she was some of your kin people, and that you had a letter from her to prove who she was.' He first intimated that he was too thick with his wife and said: 'I want you to prove who that woman was. My wife can't explain satisfactorily where she was on that night.' Webb said he was up about Martinsville, and Harold said he didn't want to know about where he was, but exactly and who was with you. Webb said if he would give him forty-eight hours he would tell him. Harold said that he thought under the circumstances it was as little as he could do to tell him where he was and who the woman was to relieve his mind, and said he could tell him as well then as

forty-eight hours later; that within forty-eight hours he could get someone to say he was at their house and he said: 'I see no excuse for waiting forty-eight hours.' Still Webb didn't tell him and Harold lost his temper and abused him. * * * About that time somebody come in and I caught Harold by the arm and said: 'Let's go.'

Testifying as a witness in his own behalf, accused denied any improper relations between Mrs. Vaden and himself. He did state, however, that he knew deceased was jealous of his wife and that he had received information that deceased was going to kill him.

On the day of the homicide accused was standing upon the main street of the village of Gretna, talking to a friend named Ramsey, when deceased approached him with the remark: "I thought I told you to get out of town." Both accused and deceased were armed with pistols, and in the difficulty which followed Vaden was instantly killed by the accused.

When the case was called for trial, the accused moved the court for a change of venire, pursuant to section 4901 of the Code, and in support thereof filed three affidavits. The affidavits were to the effect that an impartial jury could not be obtained in Pittsylvania county. The court overruled the motion to grant a change of venire, and thereupon the accused moved for a change of venue, based upon the same affidavits, which motion was likewise overruled. This action of the court constitutes the first assignment of error.

The record discloses that two jurors, competent in all respects, were selected from the regular jury panel, and that from a second jury list, drawn according to the statute, the requisite number of competent jurors were obtained.

■ ■ In *Looney* v. *Commonwealth*, 115 Va. 921, 78
S. E. 625, this court held that the trial court, in the
exercise of the powers conferred by the statute, sec-
tion 4024 (now section 4901), must of necessity have
a great deal of discretion, and the supreme court will
not reverse the judgment of the trial court, unless it
plainly appears that such discretion has been improper-
ly exercised. The fact that an impartial jury was
obtained in the county of Pittsylvania, out of a list
of forty names, raises a conclusive presumption that
the motions for a change of venire and a change of
venue were unfounded. *Muscoe* v. *Commonwealth*, 87
Va. 460, 12 S. E. 790; *Bowles* v. *Commonwealth*, 103
Va. 816, 48 S. E. 527. There is no merit in the first
assignment of error.

The second assignment of error is predicated upon
the action of the trial court in admitting in evidence
the testimony of Arthur Oakes, *supra*, and the other
witnesses who testified in regard to seeing accused and
Mrs. Vaden on the Martinsville road in August. It
is also insisted in this connection that the court erred
in admitting the conversation between accused and
decease d, as testified to by Giles Vaden, *supra*. The
contention of the accused is that the evidence was
collateral to any issue in the case, was immaterial,
irrelevant and prejudicial; that it injected into the
case a different crime than the one charged in the in-
dictment, the effect of which was to create a prejudice
against the accused in the minds of the jurors.

■ The general rule is that testimony tending to
show the commission of an offense not charged in the
indictment is inadmissible. *Walker's Case*, 1 Leigh
(28 Va.) 574. But whenever it becomes necessary to
show the relations between the parties, their state of
feelings and course of conduct towards each other,

malice and intent, and possible motive which actuated the commission of the act, then such evidence is admissible, though it tends to prove the commission of another offense.

In *O'Boyle* v. *Commonwealth*, 100 Va. 785, 40 S. E. 121, 123, this court cited with approval *People* v. *Molineux*, 168 N. Y. 264, 61 N. E. 286, 62 L. R. A. 193, and quoted therefrom as follows: "On a criminal trial, the State cannot prove any crime against the defendant which was not alleged in the indictment, as a foundation for a separate punishment, and as aiding the proof that he was guilty of the crime charged, unless such other crime tends to prove motive, intent, the absence of mistake or accident, the identity of the person charged with the commission of the crime, or a common scheme embracing the commission of two or more crimes so closely related that proof of one tends to establish the other."

In *State* v. *Reed*, 53 Kan. 767, 37 Pac. 174, 177, 42 Am. St. Rep. 322, evidence was offered by the State in support of the contention that the accused had been guilty of illicit relations with the wife of the deceased. In that case it was argued, as it is here argued, that the introduction of such evidence should be limited to cases where the killing has to be established by circumstantial evidence. In holding the evidence admissible, the court said:

"The admission of testimony showing the relations existing between the defendant and the wife of the deceased, and which tended to show a criminal intimacy between them, is assigned as error. The defendant admits that proof of a criminal intimacy between the defendant and the wife of the deceased is admissible to show the existence of a motive for the killing, at least in cases where the killing has to be established

by circumstantial evidence; and he insists that, as the killing was admitted, the motive of the defendant could be shown in a general way, but that a detailed inquiry would create new issues, and tend to divert the minds of the jury from the consideration of the principal issue; the theory of the prosecution being that the homicide was committed by the defendant because of the passion which he entertained for the wife of the deceased, of which the deceased had knowledge, and that, as he stood in the way of defendant carrying out his desires and purposes, testimony of the relations which existed between them was competent upon the question of motive. * * * The evidence is not only competent as tending to show the motive which induced the crime, but it is important also in determining the degree or grade of the crime that has been committed. As a general rule testimony tending to show the commission of another offense than the one charged is not admissible; but where such offense is intimately connected with the one charged, important proof to establish the latter cannot be excluded because it may tend to prove that the defendant is guilty of another offense."

In Underhill on Criminal Evidence (3d ed.), section 154, page 207, it is said: "Adultery committed by the accused with a woman may be proved upon his trial for the killing of the woman's husband."

We are of opinion that the evidence was clearly admissible for the reason given by the trial court, that it tended to show the motive of accused in killing the deceased.

With the evidence complained of excluded, we have this situation presented by the record: The accused is placed in the attitude of a peaceful, law-abiding citizen, murderously attacked upon the public street

by Vaden, whose only excuse for the attack is the language: "I thought I told you to get out of town." Counsel for the accused would have the principal actors enact the drama without any stage setting whatever. Under such circumstances, it would have been the duty of the jury to find the accused not guilty. The jury, however, were not to be thus circumscribed in their consideration of the case. They were entitled to know the relations of the parties before and at the time of the homicide. They were entitled to know the reason for the use of the words employed by the deceased. They were entitled to the benefit of the prior conversations between the accused and deceased relative to the alleged criminal intimacy between accused and Mrs. Vaden, as such conversations tended to throw light on the conduct of the two men in arming themselves with pistols and engaging in a duel which ended in the death of one of them.

We are unable to agree with the contention of accused that the evidence, at most, shows merely acts of indiscretion sufficient only to arouse a suspicion that the charges were true. Accused admitted that he knew deceased was jealous of his wife. He knew that on a certain night in August, 1927, Mrs. Vaden was absent from home; he also knew that Arthur Oakes had informed deceased that Mrs. Vaden was with accused on the day following; he made a false statement as to the identity of his female companion both to Oakes and deceased. He had been informed by John Dyer that deceased was going to kill him, and in turn he had informed Oakes that if deceased ascertained he was "hauling Mrs. Vaden around" he would have him to kill. Opposed to the facts and circumstances showing improper relationship, we have only the denial of accused and the added statement that

his relations with Mrs. Vaden were purely friendly. While possible, the existence of a platonic friendship between a man and a woman when one is married, or when both are married, is rare indeed. We are of opinion that the action of the court in admitting the evidence set forth in Bills of Exceptions Nos. 4 to 9 is without error.

The next assignment of error challenges the action of the trial court in refusing to grant accused a continuance when the evidence of Oakes and others was admitted.

It appears that upon a former trial of the case all of this evidence had been excluded, and the accused claimed that he was taken by surprise by its admission. In overruling the motion for a continuance, the court stated that counsel would be given a reasonable opportunity to summon witnesses to rebut the evidence complained of. The record discloses that all of the witnesses who could throw any light on the question had either testified already in the case or were easily accessible. Under such conditions there was no reason for granting a continuance, and this assignment of error is without merit.

The next assignment of error calls in question the refusal of the court to permit the accused to corroborate his witness, Pomp Dalton, by proving prior statements made by Dalton. This witness had given an account of the shooting favorable to the accused, and specifically had testified that deceased was the aggressor. On cross-examination, the Commonwealth developed that the witness had stated to a brother of the deceased that he did not see the shooting. Thereupon, accused offered to show, by one Allen, that about an hour after the fatal occurrence Dalton had made a statement to him consistent with his evidence in chief.

The court refused to permit this evidence to go to the jury.

In *Howard* v. *Commonwealth*, 81 Va. 490, it is held that the general rule is that proof of declarations made by a witness out of court, in corroboration of his statements made in court, is inadmissible.

In *Repass* v. *Richmond*, 99 Va. 508, 39 S. E. 160, 163, the exception to the rule is stated thus: "The only exception to this rule given by Mr. Greenleaf is that, where a design to misrepresent is charged upon the witness in consequence of his relation to the party or the cause, it may be shown that he made a similar statement before that relation existed. 1 Greenleaf on Ev., section 469."

The exception to the general rule has no application to the case at bar and the ruling of the trial court is, therefore, without error.

Accused complains of the action of the court in giving and refusing instructions, and in refusing to set aside the verdict.

To attempt a full discussion of the objections offered would unduly prolong this opinion. A careful consideration of the instructions in conference leads us to the conclusion that the jury were fairly and fully instructed upon the law of the case. In our opinion, the only valid criticism of the instructions is that the court went too far in its efforts to protect the rights of the accused when it gave to the jury instruction No. 5. That instruction reads thus:

"The court instructs the jury that if they shall believe from the evidence beyond a reasonable doubt that at the time Webb fired the shot that killed Harold Vaden that Vaden's hand which held his gun was held by Ramsey so that he, Vaden, could not shoot Webb, and that it did not reasonably appear to Webb at the

time that he was in danger of losing his life or suffering serious bodily harm at the hands of the deceased, then the accused cannot invoke the doctrine of self-defense, and they should find the accused guilty of some degree of homicide lower than murder in the first degree, and punish him as set out in the charge of the clerk in this cause."

The vice in the instruction is that it impinged upon the province of the jury whose duty it was, under the facts of the case, to determine whether the accused was guilty of murder in the first degree or of a lesser offense.

From what has already been said, it follows that we cannot agree with the contention of accused that the verdict is contrary to the law and the evidence.

There is no error in the judgment complained of, and it must be affirmed.

*Affirmed.*