## Richmond

## Frank Coppola
## v.
## Commonwealth of Virginia

August 30, 1979.

Record No. 781741.

Present: All the Justices.

*Augustus Anninos; J. Gray Lawrence, Jr.* (*Howell, Anninos, Daugherty & Brown,* on brief), for appellant.

*Alan Katz, Assistant Attorney General* (*Marshall Coleman, Attorney General,* on brief), for appellee.

COCHRAN, J., delivered the opinion of the Court.

On September 26, 1978, Frank Coppola was convicted by a jury of capital murder during the commission of armed robbery in violation of Code § 18.2-31(d).[1] That same day, in the separate proceeding required by Code §§ 19.2-264.3 and -264.4, the jury heard evidence as to penalty and fixed Coppola's punishment at death, as authorized by Code § 18.2-10(a). After receiving the report of the probation officer, mandated by Code § 19.2-264.5, the trial court entered judgment upon the jury verdict.

The automatic review of the death sentence imposed upon Coppola has been consolidated with the appeal of his conviction and given priority on the docket. Coppola asks that his conviction be reversed and that the case be remanded for a new trial on all issues because of alleged errors in the proceedings below, or in the alternative, that the death sentence be commuted to life imprisonment.

The evidence shows that in April, 1978, Coppola, his wife, Karen, Joseph Elliott Miltier, and Donna Mills drove to the home of Peyton and Muriel Hatchell in Newport News. The plan was for Coppola, who was disguised as a priest, to gain admittance to the house, and for Miltier to follow him into the residence for the purpose of robbing Mrs. Hatchell. The plan failed, however, when Mrs. Hatchell refused to permit Coppola to enter. Several days later, on April 22, the group decided to try another ruse to gain admittance to the Hatchell home. As directed by Coppola and Miltier, Donna Mills purchased roses which she delivered to Mrs. Hatchell at the front door. Mills was armed with a pistol given to her by Coppola. She and Mrs. Hatchell became involved in a struggle and fell down, and Coppola and Miltier then entered the house and tied up Mrs. Hatchell. In an effort to force Mrs. Hatchell to reveal where she had hidden money, Coppola struck Mrs. Hatchell in the face and repeatedly beat her head against the floor. There was evidence that Miltier also struck Mrs. Hatchell with his fist.

Hatchell returned from work during this time and was beaten in the head with a pistol by Miltier. Coppola, with socks on his hands, choked Hatchell and his wife. The robbers took $3,100 in cash from Hatchell and tied him up. They took Mrs. Hatchell's rings from her fingers and ransacked the premises, searching for more money. After Coppola, Miltier, and Mills fled from the scene of the crimes in one

---

[1] *Code § 18.2-31. Capital murder defined; punishment.*—The following offenses shall constitute capital murder, punishable as a Class 1 felony:

 *　　* *　　* *

(d) The willful, deliberate and premeditated killing of any person in the commission of robbery while armed with a deadly weapon;

 *　　* *　　* *

of Hatchell's automobiles, and rejoined Karen Coppola, Hatchell freed himself and called for help. By the time help arrived, Mrs. Hatchell had already died as the result of the blows to her head. Investigating officers found five of her front teeth scattered throughout the house. The medical evidence was that Mrs. Hatchell had died as a result of "blunt force injuries complicated by aspiration." She had vomited while unconscious and the discharge had regurgitated into her windpipe. Her head, face and body were bruised and lacerated.

Mills was subsequently arrested in connection with the offenses against the Hatchells. At first, she denied any involvement in the crimes but later, after having entered into a plea bargain with the Commonwealth under which the Commonwealth agreed to recommend that she receive life imprisonment for Mrs. Hatchell's murder, she gave detailed information about the crimes. She testified against Miltier whose trial ended less than two weeks before Coppola's trial began, and Miltier was found guilty of capital murder by a jury which fixed his punishment at life imprisonment. Mills was the chief prosecution witness against Coppola at his trial. Hatchell, who also testified, was unable to identify Coppola as one of the assailants.

Coppola has raised on brief and in oral argument various questions as to his conviction and his sentence, which we shall discuss under separate headings.

### 1. Pretrial Proceedings.

#### A. Change of Venire.

■ Coppola filed a motion for a change of venue, which he supported by copies of news articles and transcripts of radio and television broadcasts to show that because of prejudicial media coverage he could not receive a fair and impartial trial in Newport News. The motion was modified to a motion for a change of venire, and, as modified, was denied. Coppola renewed the motion and alleged, in addition to the grounds previously asserted, that the extensive publicity given to the Miltier trial, in which Coppola's wife, Karen, had testified as a witness for the Commonwealth, made it impossible for Coppola to obtain a fair trial by a Newport News jury.

A motion for a change of venire or venue is addressed to the sound discretion of the trial judge, and his action in overruling such a motion will not be reversed unless the record affirmatively shows that there has been an abuse of that discretion. *Smith* v. *Commonwealth,* 219 Va. 455, 461-62, 248 S.E.2d 135, 140 (1978), *cert. denied,* 442 U.S. 924 (1979); *Greenfield* v. *Commonwealth,* 214 Va. 710, 716, 204

S.E.2d 414, 419 (1974); *Foster* v. *Commonwealth,* 209 Va. 297, 302-03, 163 S.E.2d 565, 569 (1968); *Pannill* v. *Commonwealth,* 185 Va. 244, 252, 38 S.E.2d 457, 461 (1946); *Webb* v. *Commonwealth,* 154 Va. 866, 871-72, 152 S.E. 366, 367-68 (1930). The law presumes that a defendant can receive a fair trial from the citizens of the county or city in which the offense was committed and to overcome this presumption the defendant must clearly show that there is such a widespread feeling of prejudice on the part of the citizenry as will be reasonably certain to prevent a fair and impartial trial. *Farrow* v. *Commonwealth,* 197 Va. 353, 355, 89 S.E.2d 312, 313 (1955). A court may refuse to summon a jury from another county until an ineffectual effort has been made to obtain an impartial jury from the county in which the trial is to take place. *Pannill* v. *Commonwealth, supra,* 185 Va. at 252, 38 S.E.2d at 461; *Puryear* v. *Commonwealth,* 83 Va. 51, 53, 1 S.E. 512, 514 (1887).

The mere existence of a preconceived notion as to the guilt or innocence of an accused is not sufficient to rebut the presumption of a prospective juror's impartiality, if the juror can lay aside his impression or opinion and render a verdict based upon the evidence. *Irvin* v. *Dowd,* 366 U.S. 717, 723 (1961).

Prospective jurors in the Coppola trial were examined on *voir dire* collectively by the court and individually by counsel. Only three veniremen reported that they had been influenced or prejudiced by the media coverage and they were struck for cause. All twelve of the jurors who served had been exposed to some pretrial publicity, but five stated that they were only casually or vaguely aware of any details of the crimes. Each juror stated that he or she had formed no opinion as to Coppola's guilt and could distinguish media reports from the evidence in the case. Hence, there is no evidence in the record of the *voir dire* examination of any widespread prejudice against Coppola which would prevent his receiving a fair and impartial trial, *see Commonwealth* v. *Pass,* 468 Pa. 36, 360 A.2d 167 (1976), and we hold that there was no abuse of discretion by the trial court in denying his motion.

### B. Exclusion of Jurors.

On brief, Coppola argues that the trial court erred in striking for cause three veniremen, Ruth Lantz, Herman Henry, and Mary Raney, because of their opposition to capital punishment.

The exclusion of Ruth Lantz was based upon the following exchange:

Court: All right. My question is, do any of you have any conscientious scruples, religious or otherwise, against imposing the death penalty where it is justified by the law and the evidence?

\* \* \*

R. Lantz: Ruth Lantz. I'm against the death penalty for—punishment for a crime.

Court: All right. Now, the fact that you are against the death penalty ma'am, would this cause you to—to refuse to impose the death penalty in any case?

R. Lantz: Yes, I believe it would.

The *voir dire* examination of Herman Henry produced the following questions and answers:

Mr. Robinson: Mr. Henry, at the conclusion of all the evidence, should the evidence justify it in your evaluation of the evidence and the law justify it, could you vote for the death penalty?

Henry: That will be a hard decision for me to do.

Court: The question is, sir, could you do that?

Henry: Death penalty, no, no sir.

Robinson: Not under any circumstances, the death penalty; you could not vote for the death penalty?

Henry: I don't think so.

Robinson: Not under any circumstances?

Henry: No, sir.

On *voir dire* Mary Raney answered questions as follows:

Court: Do you have any conscientious scruples or other scruples against the imposition of the death penalty wherein it is justified by the law and the evidence?

Raney: I think that there are times when that is necessary. I am not so sure that I could vote for it, however.

Court: Let me put it this way. If, at the conclusion of this case, it appeared from the evidence and from the law that the penalty of death could be lawfully imposed, as well as other penalties, would you consider that penalty, along with your options of the other penalties?

Raney: I think I would find it very difficult to vote for that even if I felt it was justified.

\* \* \*

Raney: I don't think I could vote for that even if I felt it was right. I don't think I could vote for it, for the death penalty.

\* \* \*

Robinson: Mrs. Raney, to try to clarify the issue that should the death penalty be a possible punishment, would you—if you were on the jury, reject that consideration?

Raney: I think I would.

Robinson: Under no circumstances could you vote for it?

Raney: I don't think I could; even if I felt it was right, I don't think I could vote for it.

Robinson: Your feelings are about the death penalty, are such that you would automatically exclude it from your consideration?

Raney: I think I would have to say that I would.

Robinson: You use the phraseology, "I think," and sometimes we in the law business, do you feel that's a positive statement you're making that you would automatically exclude it?

Raney: Yes, I would automatically exclude it.

The Supreme Court has held that jurors may not constitutionally be excluded for cause "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon* v. *Illinois,* 391 U.S. 510, 522 (1968). We have construed this language to require, as a prerequisite to exclusion of a juror, an irrevocable commitment to vote against the death penalty, rather than a general objection. *Smith* v. *Commonwealth, supra,* 219 Va. at 464, 248 S.E.2d at 141; *Lewis* v. *Commonwealth,* 218 Va. 31, 35, 235 S.E.2d 320, 323 (1977). Whether such a commitment exists is an issue of fact to be resolved by the trial court, whose decision will not be disturbed on appeal unless we can say that the venireman's commitment against the death penalty was not "unmistakably clear". *Smith* v. *Commonwealth, supra,* 219 Va. at 465, 248 S.E.2d at 141.

We believe that the responses of the three veniremen whose exclusion is challenged by Coppola were sufficient to communicate an unmistakably clear commitment against the death penalty, and we hold that the trial court did not err in so finding.

## II. Incidents of the Guilt Trial.

### A. Testimony of Donna Mills.

■ Donna Mills was the only witness at Coppola's trial who described the preparation and execution of the plans to rob Mrs. Hatchell

and who related the events which occurred after the crimes had been committed.

Mills testified that as the group proceeded to Newport News to commit the robbery, Coppola's wife, Karen, cautioned her not to mention anyone's name after she entered the Hatchells' home. Mills further stated that at the motel room where the group met shortly before the crimes were committed Karen asked her whether she had "some makeup to put on Frank". Mills also testified that after the murder, when only she and Karen were together, "Karen said Frank asked her to buy him some new shoes". Coppola objected to the admission of these statements at trial and argues that they were inadmissible because of the provisions of Code § 19.2-271.2 which prohibit a wife from testifying against her husband in a criminal case without his consent.

Coppola relies upon dicta in *McMillan* v. *Commonwealth,* 188 Va. 429, 50 S.E.2d 428 (1948), that an extrajudicial statement made by one spouse "as such against the other is . . . inadmissible". *Id.* at 433, 50 S.E.2d at 430. But, in *McMillan,* three other cases were discussed, *Allen* v. *Commonwealth,* 171 Va. 499, 198 S.E. 894 (1938), *State* v. *Kosanke,* 23 Wash.2d 211, 160 P.2d 541 (1945), and *State* v. *Reid,* 178 N.C. 745, 101 S.E. 104 (1919), to the effect that where declarations of a wife are made at the request of the accused husband, or with his knowledge and consent, they are admissible. In such instances the extrajudicial statements are made by the wife as the husband's agent rather than as his spouse. We approve the rule that where the wife's extrajudicial statements are made with the actual or constructive knowledge and with the express or tacit consent of the husband, they are admissible in evidence against him.

Here, the first two statements related by Mills were made by Karen in the presence of Coppola and with his apparent knowledge and approval. While the third statement, that Coppola had asked his wife to purchase new shoes for him, was not made in Coppola's presence, Mills had previously testified that Coppola had told Karen, when all four conspirators were together, to "go get him another pair of shoes". So the subsequent statement by Karen merely repeated what Mills had already heard Coppola himself say. We hold that the trial court did not err in admitting the statements into evidence.

B. The Hypothetical Question.

■ Coppola called as an expert witness Dr. Robert Thrasher, a psychiatrist, who had observed Mills as she testified, for the purpose of answering a hypothetical question based upon a number of facts

about Mills established during the trial. The question propounded was whether, assuming all the facts to be true, Mills had any personality disorder, and, if so, what were the characteristics of the personality disorder. The trial court pointed out that Coppola had adduced the testimony of two experts that Mills had an antisocial personality. Indeed, not only did Dr. J. C. Buchanan, a psychiatrist, and Dr. E. Maleski, a clinical psychologist, testify to this effect, but Dr. M. T. San Agustin, a physician, and Dr. J. C. Dimitris, a psychiatrist on the staff of Central State Hospital, also testified as defense witnesses that Mills was nervous and emotionally upset. The trial court asked what defense counsel expected to prove by the hypothetical question that had not already been shown. Counsel proffered that Dr. Thrasher would testify that "in his opinion, this lady, Donna Mills, cannot determine the truth, when she's testifying". The trial court refused to permit the hypothetical question to be asked, to which ruling Coppola objected.

It is well settled in Virginia that the credibility of witnesses and the weight to be given their testimony are questions exclusively for the jury. *Zirkle* v. *Commonwealth,* 189 Va. 862, 870, 55 S.E.2d 24, 29 (1949); *Johnson* v. *Commonwealth,* 142 Va. 639, 640, 128 S.E. 456, 456 (1925). In any proper case, an expert witness may express his opinion upon matters not within the common knowledge or experience of the jury. *Cartera* v. *Commonwealth,* 219 Va. 516, 519, 248 S.E.2d 784, 786 (1978). However, expert testimony concerning matters of common knowledge or matters as to which the jury are as competent to form an opinion as the witness is inadmissible. Where the facts and circumstances shown in evidence are such that men of ordinary intelligence are capable of comprehending them, forming an intelligent opinion about them, and drawing their own conclusions therefrom, the opinion of an expert based upon such facts and circumstances is inadmissible. *Venable* v. *Stockner,* 200 Va. 900, 904, 108 S.E.2d 380, 383 (1959); *Strawderman* v. *Commonwealth,* 200 Va. 855, 859, 108 S.E.2d 376, 379-80 (1959); *Ramsey* v. *Commonwealth,* 200 Va. 245, 249-52, 105 S.E.2d 155, 158-60 (1958).

The existence of a disorder in Mill's personality could have been the subject of a proper hypothetical question. However, this fact had already been established by the affirmative testimony of expert witnesses who had personally treated Mills. Hence, the hypothetical question was not designed to establish the existence of a personality disorder but was intended to elicit an opinion from Dr. Thrasher concerning the veracity of Mills. From the manner in which the question was framed, relating specifically to Mills by name, and the concession

made by Coppola's counsel as to the purpose of the question, it is clear that the expert witness was expected to testify that Mill's testimony could not be believed. We conclude that the trial court did not err in excluding the question as one peculiarly within the exclusive province of the jury.

## III. The Sentence Proceeding.

### A. Exclusion of Evidence.

■ 1. Coppola complains of the trial court's exclusion of proffered testimony of Coppola's former wife, Alice Bridges, as to the adverse effect upon their two young sons of Coppola's arrest and prosecution. Under the applicable statute, Code § 19.2-264.4B,[2] discretion is vested in the trial court to determine, subject to the rules of evidence governing admissibility, the evidence which may be adduced in mitigation of the offense.

It would be strange, indeed, if the children were not embarrassed and humiliated by the prosecution of their father for the heinous crime of capital murder. But we believe that evidence of such effect is irrelevant on the issue of mitigation. It is not analogous to any of the evidence specifically approved in the statute. The kind of evidence therein contemplated bears upon the record of the defendant and the atrociousness of his crime. Evidence of a good previous record, and extenuating circumstances tending to explain, but not excuse, his commission of the crime, is admissible mitigating evidence for the jury to consider in determining whether the defendant will probably be a continuing serious threat to society, or whether his conduct in committing the murder was outrageously or wantonly vile, horrible or in-

---

[2] Code § 19.2-264.4B provides as follows:

"B. In cases of trial by jury, evidence may be presented as to any matter which the court deems relevant to sentence, except that reports under the provisions of § 19.2-299, or under any Rule of Court, shall not be admitted into evidence.

"Evidence which may be admissible, subject to the rules of evidence governing admissibility, may include the circumstances surrounding the offense, the history and background of the defendant, and any other facts in mitigation of the offense. Facts in mitigation may include, but shall not be limited to, the following: (i) The defendant has no significant history of prior criminal activity, or (ii) the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance or (iii) the victim was a participant in the defendant's conduct or consented to the act, or (iv) at the time of the commission of the capital felony, the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was significantly impaired; or (v) the age of the defendant at the time of the commission of the capital offense."

human. But the effect of his incarceration upon relatives is not a mitigating circumstance for the jury to consider. We hold that there was no abuse of discretion by the trial court in excluding the evidence.

■ 2. Coppola also argues that the trial court erred in refusing to admit into evidence the fact that Joseph E. Miltier had been convicted of the capital murder of Mrs. Hatchell and sentenced to life imprisonment. We disagree.

This evidence was not admissible in mitigation of the offense under Code § 19.2-264.4, and the trial court did not abuse its discretion in refusing it as irrelevant. Under Code § 17-110.1C our Court is required to consider and determine whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, but no such responsibility is imposed upon the jury in the trial court. The jury, in the sentencing phase of the trial, is required to consider evidence in mitigation of the offense relevant to the defendant's past record and the nature of his conduct in committing the crime. Evidence as to the result of another defendant's trial for the same crime is irrelevant to the determination by the jury of the appropriate punishment for the defendant whose sentence is being weighed.

B. Instructions.

■ Coppola contends that the trial court erred in granting Instructions 2, 3, and 4, which defined the terms "aggravated battery", "wantonly", and "vile", respectively. As we implied in *Smith, supra,* it is not imperative that the words used in the statute be defined in instructions, and we there construed "aggravated battery" to mean a battery which is more culpable than the minimum necessary to accomplish an act of murder. *Id.* at 478, 248 S.E.2d at 149.

The challenged instructions were not artfully drawn, but Coppola's counsel did not object to them as incorrect definitions. He objected only that defining the words of the statute would serve no purpose and inflame the jury. He cited no authority for this objection. Moreover, when the trial court offered to strike Instruction 4, broadly defining "vile", if the definition was incorrect, Coppola's counsel merely reiterated his objection that the definition was inflammatory. The objection on that ground is insufficient.

If the definitions were not incorrect, we believe that the trial court could properly give the instructions. The trial court retained discretion to determine the advisability of explicating for the jury certain legal terminology used in the statute. We cannot say that the trial court abused its discretion in deciding to assist the jury in this respect. Nor can we say that the definitions inflamed the jury. The challenged in-

structions defining the statutory terms "wantonly" and "aggravated battery" were represented to the trial court, without contradiction, as adhering very closely to the meanings of these words described in Black's Law Dictionary. But we do not pass here on the correctness of these definitions, either generally or as applied to the evidence in this case, because counsel did not raise that issue in the trial court, and we will not notice grounds that were not stated at a time when the trial court could consider them. Rule 5:21. The thrust of the objection was that no instruction defining the words was proper.

■ Coppola argues that the trial court erred in refusing his proffered Instruction D[3] because the statute, Code § 19.2-264.4C, does not require that upon proof beyond a reasonable doubt of one of the two aggravating circumstances therein prescribed the jury must recommend the death sentence. But Instruction 1 given by the court followed the language of the statute without deviation. Consequently, neither the statute nor the instruction required the imposition of the death sentence upon proof of one of the aggravating factors. Moreover, the court gave another instruction that if, upon consideration of all the evidence, there existed a reasonable doubt as to any fact or conclusion the jury was required to find before the death penalty could be imposed, the jury should recommend life imprisonment. We hold that the trial court did not err in refusing Instruction D.

### C. Product of Passion or Other Arbitrary Factors.

■ Coppola reiterates his argument that the pretrial publicity prejudiced his trial. He says that this publicity, particularly that relating to his wife's testimony during the trial of Joseph Miltier, inflamed the jurors and caused the jury to impose the death sentence. We have heretofore in this opinion considered the assignments of error relating to pretrial publicity that was alleged to have prejudiced Coppola's trial and have found no error in the trial court's ruling. We find nothing in the record to substantiate Coppola's allegation that the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

---

[3] "INSTRUCTION D

"The Court instructs the jury that it is your function to determine from the evidence and the instructions of the Court, whether the defendant will be sentenced to death or to life imprisonment, and, in that connection, you should not arbitrarily impose the death penalty upon the defendant even though you should find beyond a reasonable doubt those conditions without which the death penalty cannot be imposed. Even if you find those conditions, beyond a reasonable doubt in accordance with other instructions of this Court, it is your duty to consider a sentence of life imprisonment."

D. Excessiveness.

Under Code § 17-110.1C we are also charged with the responsibility of determining whether the sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant".

While Coppola's brutal acts did not include rape, and were thus different from those revealed in *Smith* v. *Commonwealth, supra, Waye* v. *Commonwealth,* 219 Va. 683, 251 S.E.2d 202, *cert. denied,* 442 U.S. 924 (1979), and *Mason* v. *Commonwealth,* 219 Va. 1091, 254 S.E.2d 116 (1979), they fully justified the jury's finding that his conduct was punishable by death under the provisions of Code § 19.2-264.2. His sentence is not disproportionate to the three death sentences affirmed by us in *Stamper* v. *Commonwealth,* (this day decided), for triple murders committed during an armed robbery, or to the death sentence affirmed by us in *Clark* v. *Commonwealth,* (this day decided), for murder for hire, where the death sentence of a codefendant was commuted by the trial court to life imprisonment.

Other jurisdictions have recently considered cases involving murder and armed robbery and have approved the death penalties therein imposed by juries. *State* v. *Richmond,* 114 Ariz. 186, 560 P.2d 41 (1976), *cert. denied,* 433 U.S. 915 (1977); *Cooper* v. *State,* 336 So.2d 1133 (Fla. 1976), *cert. denied,* 431 U.S. 925 (1977); *Gholson* v. *State,* 542 S.W.2d 395 (Tex. Crim. App. 1976), *cert. denied,* 432 U.S. 911 (1977); *Hill* v. *State,* 237 Ga. 794, 229 S.E.2d 737 (1976). Nevertheless, we believe that our consideration of similar cases should be limited generally to cases arising in Virginia under our revised death penalty statutes.

Except in the case of murder for hire, only the immediate perpetrator of a homicide, the one who fired the fatal shot, and not an accessory before the fact or a principal in the second degree, may be convicted of capital murder under the provisions of Code § 18.2-31, as qualified by Code § 18.2-18.[4] *Johnson* v. *Commonwealth,* 220 Va. 146, 225 S.E.2d 525 (1979). In the present case, there is evidence that Coppola and Miltier jointly participated in the fatal beating

---

[4] **Code § 18.2-18. How principals in second degree and accessories before the fact punished.**—In the case of every felony, every principal in the second degree and every accessory before the fact may be indicted, tried, convicted and punished in all respects as if a principal in the first degree; provided, however, that except in the case of a killing for hire under the provisions of § 18.2-31(b) an accessory before the fact or principal in the second degree to a capital murder shall be indicted, tried, convicted and punished as though the offense were murder in the first degree.

of Mrs. Hatchell. There is also evidence that Miltier actively participated with Coppola in planning and committing the robbery during which the murder was perpetrated, and Donna Mills testified that Miltier believed that his blows actually killed Mrs. Hatchell.[5] Since both Coppola and Miltier were convicted of the capital murder of Mrs. Hatchell, each was found by a jury to be an immediate perpetrator of that crime.

 Coppola protests that his sentence is disproportionate to the sentences imposed in the cases bearing the greatest similarity to his case, namely, the sentences imposed upon his three confederates, Joseph Miltier, Donna Mills and Karen Coppola. Miltier was sentenced to life imprisonment. It was represented to us, and not contradicted, that Mills was sentenced to life imprisonment, and that Karen Coppola had not been sentenced when this appeal was argued. However, Mills and Karen Coppola cooperated with the Commonwealth. Mills testified against both Miltier and Coppola; Karen Coppola testified against Miltier. Their cooperation puts them in a different category from Miltier and Coppola and diminishes the similarity of the cases. Mills had entered into a plea bargain with the Commonwealth pursuant to which the Commonwealth had recommended to the trial court that she receive a sentence of life imprisonment on the capital murder charge.

Although Miltier may have believed that he delivered the final death blow to Mrs. Hatchell, most of his attention was directed to her husband, and Coppola dealt primarily with her. Only Coppola, with bloody socks on his hands, choked Mrs. Hatchell in Hatchell's presence. It was Coppola who told Hatchell that he would cut off one of her breasts if Mrs. Hatchell did not reveal where the money was hidden. Coppola was the one who ordered Mills to place a towel over Hatchell's head to prevent him from seeing what was being done. Miltier also struck Mrs. Hatchell, but Coppola returned several times to the room where she was held captive and, angry that he had not found any money, repeatedly beat her head against the floor. When Mills found and delivered a metal box to Coppola, he gave her the

[5] We have reviewed the record of Miltier's trial, *Miltier* v. *Commonwealth*, Record No. 790063, in which Donna Mills and Karen Coppola testified as witnesses for the Commonwealth. Mills testified that it was Miltier who conceived the plan to purchase flowers and deliver them to Mrs. Hatchell in order to gain entrance to the residence; that she saw Coppola hit Mrs. Hatchell with his fists and beat her head on the floor, and that Milter hit her with his fist "but not like Frank did". The next morning, when Mills and Miltier read of Mrs. Hatchell's death Miltier said, "How do you think I feel? I know I'm the one that killed her". Miltier told Mills that "he hit her with all his might in the head".

keys to one of the Hatchells' cars and ordered her to leave the house and get into the vehicle. The evidence leads to the conclusion that Coppola was not only a joint murderer of Mrs. Hatchell but that he was also the leader in organizing and directing the group to commit the armed robbery. His conduct towards Mrs. Hatchell, however, culminating in her death, appears from Mills's testimony to have been more violent and vicious than that of Miltier, and thus distinguishable.

Moreover, we do not believe that a codefendant is necessarily entitled to commutation of a death sentence because an equally culpable confederate, on substantially the same evidence, has been sentenced to life imprisonment. In *Gregg* v. *Georgia,* 428 U.S. 153 (1976), the Georgia death penalty statutes, similar to our own, requiring a bifurcated proceeding, were approved. The Supreme Court recognized that some degree of discretion inheres in our criminal justice process, noting particularly that the trial jury "may choose to convict a defendant of a lesser included offense rather than find him guilty of a crime punishable by death, even if the evidence would support a capital verdict". *Id.* at 199.

A jury's decision not to recommend the death sentence where the evidence would support such a sentence does not change the applicable statewide standard.

"Since the proportionality requirement on review is intended to prevent caprice in the decision to inflict the penalty, the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk of arbitrariness or caprice."
*Id.* at 203.

The Supreme Court approved the principle pronounced in *Moore* v. *State,* 233 Ga. 861, 864, 213 S.E.2d 829, 832 (1975) that under the similarity standard it would be assumed that no death sentence will be affirmed unless in similar cases throughout Georgia the death penalty has been imposed generally. *Gregg* at 205.

We construe *Gregg* to permit a death sentence against one defendant to be upheld when a sentence of life imprisonment, or less, has been imposed upon a codefendant, provided the death sentence is in accord with the general statewide standard. A jury may decide to impose a death sentence, or life imprisonment, or a lesser punishment for a lesser included offense, or to acquit altogether. Accordingly, comparisons between the penalties imposed upon codefendants may

be unproductive. A determination of proportionality of punishment requires only that a defendant's death sentence not be incommensurate with his conduct, measured by other jury decisions, on a statewide basis, involving similar conduct. If juries generally in this jurisdiction impose the death sentence for crimes comparable with Coppola's, then Coppola's death sentence is not excessive or disproportionate, although Miltier's punishment was fixed at life imprisonment. *See Stamper* v. *Commonwealth,* 220 Va. 260, 257 S.E.2d 808 (1979), (this day decided).

After reviewing the records, and considering the crime and the defendant, we hold that the atrociousness of Coppola's conduct exceeded that of Miltier, and that the sentence of death is not excessive or disproportionate to death sentences generally imposed by Virginia juries in horrifying crimes of a similar nature.

For the reasons assigned, we hold that there was no reversible error in the rulings of the trial court, and that the sentence of death was not excessive or disproportionate. Accordingly, we will affirm the judgment entered upon the jury verdict finding Coppola guilty of capital murder, and the sentence of death imposed by the trial court pursuant to the jury's recommendation.

*Affirmed.*