## Richmond

HARRY EUGENE FULLER v. COMMONWEALTH OF VIRGINIA.

April 25, 1960.

Record No. 5067.

Present, All the Justices.

The opinion states the case.

*Lewis D. Morris*, for the plaintiff in error.

*John W. Knowles, Assistant Attorney General (A. S. Harrison, Jr., Attorney General,* on brief), for the Commonwealth.

SPRATLEY, J., delivered the opinion of the court.

Harry Eugene Fuller was indicted for first degree murder of Bobby Gene Padgett. Being without counsel and without means to employ one of his choice, the court appointed an able and competent attorney at law to defend him. Upon his arraignment, the defendant, after consultation with his counsel, entered a plea of not guilty, in his own proper person. A jury found him guilty as charged in the indictment and fixed his punishment at death. From a judgment confirming that verdict, this writ of error was awarded.

The evidence was without conflict. On February 3, 1959, about 11:50 p.m., Joseph Seraphin and Bobby Gene Padgett, Police Officers of the city of Alexandria, reported to the Police Headquarters of that city for duty. There they found Jessie Brown bleeding profusely from a wound on his head, with blood on his face, the back of his neck, and his clothes. Brown was asked what had happened. He told them he had been hit on the head "with an object" by a man named Fuller, at 125 South West Street and that a woman at that address "might be dead."

South West Street was within the patrol area of Seraphin, and the area to the east was assigned to Padgett. The two officers were ordered to go to 125 South West Street, in the city of Alexandria, and look for the man named Fuller. Padgett's police cruiser was at hand and he immediately proceeded to the scene of the alleged offense. He drove slowly. A few minutes later, Seraphin obtained his car and followed Padgett. When Seraphin arrived at a short distance from 125 South West Street, he parked his car behind that of Padgett. Seraphin then saw two colored persons walking on the sidewalk, about the middle of the block. He approached them and asked for identification. They identified themselves as Harry Eugene Fuller and his wife, Madeline Fuller. Seraphin placed Fuller under arrest, and so informed Padgett when the later came up to them.

Fuller asked what he was being arrested for, and was told by Padgett that it was, "For felonious assault on Jessie Brown." He was allowed to talk to his wife for a few minutes and he asked her to get a bondsman, so that he would not have to spend the night in jail. He then started walking away from the officers. Seraphin

grasped one of the defendant's arms and Padgett took hold of the other. Seraphin got a handcuff on one of the wrists of the defendant, and Padgett tried to pull defendant's arm around so as to get the cuff on the other wrist. Fuller resisted and this resulted in a scuffle among the three. It was raining, the weather was cold, and the street and sidewalk icy. The two officers and the defendant fell in the gutter near the curb. Fuller was on top of Padgett, and Seraphin was on top of Fuller, attempting to pull the latter off Padgett. Padgett exclaimed: "He has a gun," or "He has my gun." Immediately a shot was fired. Seraphin released his hold on Fuller and tried to go to his car. Then a second shot was fired and Seraphin heard Padgett scream. Fuller then began to shoot at Seraphin, and shots were exchanged between the two. Seraphin was hit in the left arm, but managed to reach a place of safety where he summoned help.

Padgett died on the spot where he was shot. An autopsy disclosed that he had been struck by two bullets, and that his death was due to one of the bullets severing the pulmonary artery. In addition, he had lacerations over the face and upper lip, and there were three depressed fractures of his skull.

Warren W. Zimmerman, a lieutenant of the Police Department of the city of Alexandria, heard the complaint made by Brown at the police station. After dispatching Seraphin and Padgett to the scene of the offense, he drove in his car towards South West Street. As he approached, he had to stop for a traffic light, and while waiting there, he saw a man leave the middle of the street and go between two houses. He parked his automobile behind the cars of the other two officers, and went to an alley way. Seeing the man appear, he called upon him to halt, and come back. The man threw up his hands, came back to the officer, and when asked his name replied: "Eugene Fuller." Zimmerman directed Fuller to return to the place where Padgett's car was parked. He questioned Fuller about the assault on Brown, and asked why he was roaming around. Fuller replied that he "had to fight his way through the house and try to get to his wife," and that the "G. D. police came along and tried to put cuffs on him." Zimmerman told Fuller he was the man he was looking for, arrested him, searched him, and found no weapon on him.

Zimmerman did not know then what had taken place; but soon discovered that Padgett had been killed. Shortly thereafter, Seraphin came up, and said: "That is the man who shot Officer Padgett." Zimmerman asked Fuller "Did you shoot this man?" Fuller replied:

"You are goddamned right I shot him." Asked what he did with Padgett's gun, he said he threw it under one of the police cars, where it was later found.

Fuller was taken to police headquarters about 3:00 a.m., on February 4, and was there questioned by Detectives McGowan and Gosney. Detective Gosney was sent to South West Street to look for an iron bar, which Fuller said he had hit Jessie Brown with. The iron bar, a tire iron, was found in a vacant lot next to the house, where Brown said he had been assaulted.

McGowan testified that he and Gosney told the defendant that he did not have to make any statement whatever; that if he did it would be used against him; and that he was entitled to counsel. Fuller then gave them the following statement, which was reduced to writing by McGowan, signed by Fuller and witnessed by Sergeants Gosney and McGowan:

"February 4th, 1959. I, Harry Eugene Fuller, now held by the police in connection with burglary, murder, and felonious assault make the following voluntary statement about the matter to Sergeant William Gosney and Sergeant Thomas J. McGowan, who have identified themselves to me as officers of the Alexandria Police Depatrment. I have been advised I do not have to make any statement, and my statement I do make can be used against me in a Court of Law. I have also been advised that I can also consult an attorney. No threats, promises or offers of reward have been made to me in securing this statement. Q. What is the extent of your education? A. Third grade. Q. Can you read and write? A. No, but can write my name only. [Here follows a detailed report of the forceful entry of Fuller in the dwelling of Brown, the finding of his wife there, and an attack upon Brown by Fuller, and the departure of Fuller and his wife to the street, where they were found by Officers Seraphin and Padgett.] One of the police came up to me and asked my name. I told him my name. He walked a short distance passed (sic) me, and the other officer asked me my name. When I told him my name, he said, 'This is him.' This officer pulled out his handcuffs and put the cuff on my left wrist. I said, 'Let me speak to my wife, because if you all lock me up Jessie will have her back in that house.' At this time the other officer bent my arm behind me, and they said, 'You are not trying to resist arrest, are you?' At this time all three of us began to scuffle. I suppose I was upset because I was being arrested. In the scuffling, I fell on my face. One of the officers fell along side of me, and one on my back. I believe the officer was

on my left side. The officer on my left side must have reached for his gun, or it may have fell from his holster, as it fell in front of me. I grabbed the gun. He then grabbed my hand that held the gun. I began to pull the trigger. I don't know how many times the gun went off. The officer that was fighting for the gun never got off the ground. When I pulled the trigger of the gun, it was pointed at the officer. The other officer, when I saw him, was some distance from me in the street, and he began to shoot at me. He hit me once, but did not knock me down. I believe I shot one time at this officer. When I got the gun from the officer that fell along side of me, I struck him in the head two or three times with the gun barrel. I then began to shoot him. When all the shooting was over, I threw the officer's gun underneath one of the police cars. While all this was going on, I still had the handcuff on one of my wrists. I left the scene and was walking in a small alley between two houses, and a police officer came up to me and shined a light in my face, and told me to stop. I have read this statement, and certify by my signature that is a true statement to the best of my knowledge. Signed: Harry E. Fuller, witnessed by myself and Sergeant Gosney."

McGowan further said that Fuller told him he got angry when the officers tried to arrest him.

On the morning of February 4, 1959, Fuller was taken to the scene of the crime, and there re-enacted the events which he said had occurred earlier. He there told McGowan that he struck Padgett before shooting him, saying, "I don't know how many times I struck the officer. I struck him many times and fast."

Willie Simms, who lives at 119 South West Street, said he had heard some argument outside of his home, and as he woke up he heard two or three shots. He went to the window of his bedroom and saw a man fall against the front of a police car, and another person walk over to the fallen man and kick him as he lay on the ground.

Jessie Brown, who lived at 125 South West Street, where Fuller's wife had also been staying for about three months, said that he was in bed when Fuller broke into his house, came upstairs, hit him over the head with an iron rod; that both went downstairs where Fuller struck him again; that he went to police headquarters, told them about the assault; and was thereafter taken to a hospital where they "started sewing on" him.

The defendant did not testify nor offer to produce any evidence in his behalf. He elected to stand on his written statement made to

Sergeants McGowan and Gosney, which was introduced in evidence without objection.

■ Defendant objected to the admission of the testimony of Seraphin relating to the statements of Brown at police headquarters concerning the assault made upon him by Fuller, on the ground that it was hearsay evidence. The court overruled the objection; but instructed the jury that the evidence was admissible only for the purpose of showing why the police officers arrested Fuller without a warrant.

The hearsay rule does not operate to exclude evidence of a statement, request, or message offered for the mere purpose of explaining or throwing light on the conduct of the person to whom it was made. The evidence was admitted not for the purpose of showing the guilt or innocence of the defendant; but for the purpose of showing the reason for the police officers' action in arresting him.

This exception to the hearsay rule is stated in 6 Wigmore on Evidence, 3rd Edition, § 1789, as follows:

"Wherever an utterance is offered to evidence the state of mind which ensued in another person in consequence of the utterance, it is obvious that no assertive or testimonal use is sought to be made of it, and the utterance is therefore admissible, so far as the hearsay rule is concerned."

To the same effect see 7 M. J., Evidence, § 195, page 579; 22 C. J. S., Criminal Law, § 718, page 1229; The Law of Evidence, Va. and W. Va., § 136, page 242; *State* v. *Paun*, 109 W. Va. 606, 155 S. E. 656; *Day* v. *Adkins*, 112 W. Va. 322, 164 S. E. 238.

Defendant also objected to the testimony of Zimmerman relating to statements made to him by the defendant at the time of his arrest on the ground that the statements were not freely and voluntarily made, and defendant had not been advised of his constitutional rights. This contention finds no support either in defendant's own written statement, his actions, or in the evidence of the other witnesses. *Mendoza* v. *Commonwealth*, 199 Va. 961, 963, 103 S. E. 2d 1; *Owens* v. *Commonwealth*, 186 Va. 689, 43 S. E. 2d 895.

■ The principal contention of the defendant is that the court erred in ruling that the police officers, as a matter of law, had reasonable ground to believe a felony had been committed, and that, therefore, it was not required that a warrant be issued for Fuller before his arrest. Defendant says that the question whether or not he was resisting a lawful or unlawful arrest was for the determination of the jury.

The statement of Brown speaks for itself. His statement and his condition clearly indicated that a malicious or unlawful assault had been made upon him, with intent to maim, disfigure, or kill him. Fuller was told that he was being arrested for a felonious assault, and he did not question the validity of his arrest without a warrant. Cf. *Muscoe v. Commonwealth*, 86 Va. 443, 10 S. E. 534.

After hearing Brown's statement, observing his condition, and having been told that a woman might be dead at the place where he had been assaulted, the only reasonable conclusion the officers could reach was that a felonious assault had been committed by the offender named. There was no evidence contradicting the statement, and the investigation revealed the truth of the felonious assault.

It follows that the trial court did not err in holding that the arrest of Fuller was lawful.

We find no error in the granting and refusal of instructions. Six were granted at the request of the Commonwealth and eight at the request of the defendant. They fully and completely covered all aspects of the case as warranted by the law and the evidence.

Defendant's objections to instruction number 2, requested by the Commonwealth, and to the refusal to grant his instructions A and B, were based upon the hypothesis that the defendant was subject to an illegal arrest, a hypothesis which finds no support in the evidence. Defendant's requested instruction K, defining voluntary manslaughter, and L, defining first and second degree murder under circumstances not in evidence, were inapplicable to the facts presented in this case.

There is no merit in the contention that the court should have set aside the verdict as contrary to the law and the evidence. The killing of Officer Padgett was the result of the wanton, wilful, malicious, and deliberate intent of the defendant. There were no circumstances of extenuation or palliation, and the killing did not result from sudden, momentary excitement, nor from sudden passion, engendered by provocation. The elements necessary to elevate the crime to murder in the first degree were established by the Commonwealth. It is the will and purpose to kill and not necessarily the interval of time which fixes the grade of the offense. *Bailey* v. *Commonwealth*, 191 Va. 510, 62 S. E. 2d 28; Virginia Code, § 18-30, and cases cited.

For the reasons stated, the judgment of the trial court is affirmed.

*Affirmed.*