## Alexandria
ROCHELLE JOYCE ASCHER

v.

COMMONWEALTH OF VIRGINIA

No. 1011-89-4

Decided August 13, 1991

COUNSEL

John P. Flannery, II, for appellant.

John B. Russell, Jr., Senior Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**COLEMAN, J.**—In February of 1987, Rochelle Joyce Ascher was indicted by a Loudoun County grand jury on eleven counts of securities fraud[1] in violation of the Virginia Securities Act, Code § 13.1-501 *et seq.*, occurring from 1984 through 1986. The

---

[1] Count 1 charged Ascher with selling unregistered securities in the form of promissory notes in violation of Code § 13.1-507.

Count 2 charged Ascher with transacting business as an unregistered broker-dealer, investment advisor and agent in violation of Code § 13.1-504.

Counts 3 through 11 charged that Ascher did unlawfully offer and sell securities to various persons in violation of Code § 13.1-502, which reads:

"It shall be unlawful for any person in the offer or sale of any securities, directly or indirectly,

(1) To employ any device, scheme or artifice to defraud, or

grand jury later indicted Ascher for conspiracy to commit securities fraud in violation of Code §§ 18.2-22 and 13.1-520(A).

The allegedly fraudulent sales arose out of Ascher's position as a fundraiser for Lyndon H. LaRouche, Jr., and his political organization, the National Caucus of Labor Committees (NCLC). As a fundraiser, Ascher solicited contributions and loans from LaRouche political supporters to underwrite LaRouche's political publications and endeavors. She issued promissory notes obligating the LaRouche organizations as evidence of the indebtedness for the loans. After a ten-week jury trial, during which the trial court dismissed three of the charges for improper venue, the jury convicted Ascher on the eight counts of securities fraud and on the conspiracy count. The jury recommended penitentiary sentences totalling eighty-six years. The trial judge suspended certain sentences and ordered that others be served concurrently, resulting in Ascher receiving concurrent penitentiary sentences of ten years to be served and a ten-year suspended sentence.

Testimony from lenders, co-workers and from Ascher explain her participation in the transactions which led to these securities prosecutions and convictions.

Rochelle Ascher, a college graduate who has almost completed the requirements for a masters degree in education, played a key role in fund-raising for the NCLC. She served as a supervisor of fund-raising, which included personally soliciting loans, training other fund-raisers, and issuing promissory notes. After joining the

(2) To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) To engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon the purchaser."

Significantly, each of these counts charged that Ascher violated the various provisions of the Virginia Securities Act knowingly and willfully, thus invoking the criminal sanctions imposed by Code § 13.1-520(A):

"Any person who shall knowingly and willfully make, or cause to be made, any false statement in any book of account or other paper of any person subject to the provisions of this chapter, or knowingly and willfully exhibit any false paper to the Commission, or who shall knowingly and willfully commit any act declared unlawful by this chapter, with the intent to defraud any purchaser of securities or user of investment advisory services or with intent to deceive the Commission as to any material fact for the purpose of inducing the Commission to take any action or refrain from taking any action pursuant to this chapter, shall be guilty of a Class 4 felony."

NCLC in 1973, Ascher began working for NCLC full time in January 1980, when she became head of the phone team in the Baltimore regional office. Ascher solicited loans for several subsidiary companies of the NCLC whose functions were writing, editing, publishing, and mailing political publications. The companies for which Ascher solicited loans were: Caucus Distributors, Inc.; Campaigner Publications, Inc.; Executive Intelligence Review; Fusion Energy Foundation; and Publication & General Management, Inc. Known within the LaRouche organization as "infrastructure loans," the funds were used to support publication costs of the companies and the entire organization's operating expenses, which averaged $600,000 per week. "Infrastructure debt" was kept separate and distinct from the debt created by fund-raising for Lyndon LaRouche's political campaigns.[2]

The national headquarters for the NCLC and its operating companies, known as the National Center, moved to Leesburg, Virginia from New York in 1984. Ascher maintained frequent daily telephone contact from Baltimore with her phone team counterparts in the National Center, exchanging names of potential lenders and information on successful fund-raising tactics. The Finance Office of the National Center was responsible for banking the funds, accounting, paying vendors, and tracking and paying debts for the affiliated companies of the NCLC. Ascher communicated frequently with members of the Finance Office, particularly Donald Phau, its director, and William Hintz, whose primary responsibility was to track repayment of the loans and handle complaints.

As head of the phone team in Baltimore, Ascher trained new fund-raisers there and in the National Center. Trainees started as "boilers" who would make cold calls to individuals whose names had usually been obtained through door-to-door and airport fund-raising operations. Ascher helped train the boilers to make "cold hits," which was obtaining small contributions from first-time calls. Boilers were provided scripts, and members of the phone team, including Ascher, would critique their calls and suggest im-

---

[2] Funds for LaRouche's political campaigns were raised by separate organizations known as Independent Democrats for LaRouche and LaRouche Campaign. The Commonwealth acknowledges that promissory notes issued as evidence for a loan to a political campaign may qualify for an exemption in the discretion of the commission under Code § 13.1-514.1(B).

proved techniques. Ascher instructed the boilers to convey a sense of urgency and to ask the potential lender to support a specific organization project. Cold hits were then referred to members of the phone team, such as Ascher, who would attempt to solicit what the fund-raisers knew as "specials," which are loans, contributions, or sales in excess of $5,000.

Fund-raisers, including Ascher, had a uniform method of soliciting loans. They discussed various political issues with the potential lenders before seeking a contribution. If it appeared that the contact would not make a contribution, the fund-raiser would then solicit a loan, usually promising a higher interest rate than banks. Ascher and other fund-raisers told the contacts that the banks were a "bunch of crooks" and "drug money launderers." When a lender would inquire about the loan repayment history of the organization, the standard procedure was to inform the potential lender that his or her money would be completely safe. When a contact committed to make a "special," to avoid any delays or change of mind, a courier was dispatched to receive the money. The lender was issued a promissory note at the promised rate of interest.

As head of the Baltimore region, Ascher also supervised progress toward meeting regional and national quotas, which had been set by the National Executive Committee (NEC) located in Leesburg. The National Center held daily morning and evening briefings to announce the progress toward the quotas, which information was disseminated to the regions throughout the day. Ascher also kept records of each fund-raiser's progress toward individual quotas set by the NEC.

Ascher was also responsible for issuing many of the promissory notes for the loans solicited from the Baltimore office. She retained a copy of each note and sent a copy to the National Center. When the Baltimore Office was not to issue the promissory note for a particular loan, Ascher would execute a loan voucher form which was sent to the Finance Office at the National Center to issue the note. The National Center would issue a blank promissory note signed by an officer of the organization, usually William Hintz, on terms contained in the loan voucher form prepared and submitted by Ascher or from her counterpart in the other regions.

In early 1985, after the National Center had moved to Leesburg, promissory notes were generally issued from the National Center rather than from regional offices. By August 1985, the organization began using letters of indebtedness. The letter of indebtedness contained the terms of the loan, but was written in the form of a letter so as to appear less like a promissory note. Hintz testified that the National Center changed to a letter of indebtedness, and also shortened the term of repayment to eight or nine months, in order to make the loan not have characteristics of a security.

As early as 1984, Ascher became aware that loans were being repaid on a selective basis. She reviewed lists of loans owed to lenders; she knew the weekly budget allotted for repayment of loans was less than the amount owed and that funds did not exist to repay all the lenders in the Baltimore region. Since only a few lenders would be repaid, the Finance Office established a system to prioritize lenders into categories. For example, the "legal" category were lenders who filed lawsuits, had threatened legal action, or had retained an attorney. The "hardship" category included lenders who demanded repayment because they were in financial straits. A third category was politically active and influential people with whom the NCLC wanted to maintain a good reputation.

Ascher regularly contacted the Finance Office about ranking individuals for repayment, and she kept her own ranking of those lenders she considered important. As early as June 1984, Ascher personally received numerous and regular complaints about nonrepayment from lenders. Despite ongoing complaints and daily communication with the finance office at the National Center regarding the organization's inability to repay, Ascher continued to solicit loans as late as November 1986. Although Ascher claimed to have been forthright about the organization's difficulties, others testified that she continued to promise lenders that "we always . . . pay back every person," and that for "thirteen years" the organization never had any problem repaying loans. Transcripts of her telephone solicitations made to an undercover investigator during September 1986 confirm that she made these representations. Ascher continued to solicit loans after federal and state search warrants were executed on the organization's headquarters in Leesburg in October 1986.

In 1985, Lyndon LaRouche and his organizations came under scrutiny from various law enforcement agencies in Virginia and elsewhere. Extensive publicity regarding Mr. LaRouche and his organization's dealings appeared in newspapers and news broadcasts in the Leesburg, Loudoun County, and Washington, D. C. areas. In July 1987, two years before her trial, Ascher filed a motion to change venue on the ground that extensive adverse pretrial publicity would make it impossible to seat an impartial jury in Loudoun County. The trial court deferred ruling on the motion before it attempted to seat a jury. During the ensuing months until trial, publicity increased about the case and the LaRouche organization, since, in the interim, Lyndon LaRouche had been tried and convicted in Loudoun County, and was scheduled to be sentenced around the time that Ascher's trial was to begin. Jury selection began on January 23, 1989. It lasted eight days, during which one hundred and fifteen venire persons were examined on *voir dire.* When the trial court seated a panel which it considered free from exception, it overruled Ascher's motion to change venue over her continued objections.[3]

Ascher's trial lasted ten weeks. The witnesses included those people who had dealt with Rochelle Ascher, had loaned the organization money and received a promissory note. Other witnesses included state investigators who had examined the records and operations of NCLC, and former NCLC co-workers of Ascher.

Ascher has been granted an appeal on six assignments of error, which we address in order:

## I.  JURY SELECTION

*Change of Venue*

First, Ascher contends the strongest evidence that the trial court should have granted her motion to change venue is the fact that it did so for every other defendant indicted in Loudoun County in the LaRouche related prosecutions. We reject this argument. Following jury selection in Ascher's case, the trial court made known its inclination to change venue in the other related

---

[3] In subsequent prosecutions of other defendants indicted in Loudoun County for similar offenses arising from their involvement in raising funds or obtaining loans for the LaRouche related organizations, the trial court granted a change in venue, conceding that the court had "extreme difficulty" in seating a jury in Ascher's case.

cases:

> [I]n light of the fact that the voir dire in this case took longer than was anticipated by the Court being of the opinion that the timing of the LaRouche sentencing and findings complicated voir dire here, so that it took longer than this court anticipated.
>
> Now, with that having occurred and now with this case being in the media, it may be even more difficult to obtain another venire in Loudoun County.

The trial court's decision to change venue in subsequent cases was based upon the circumstances existing at that time those cases came to trial. Also, the decision to change venue in those cases was discretionary, rather than mandatory, and was based upon practical considerations of time, expense, and inconvenience in seating an impartial jury in Loudoun County. Whether the trial court erred in denying a change of venue depends upon the circumstances in this case, not the situation in other cases.

■ Ascher further contends the trial court erred by denying her motion to change venue based on pretrial publicity which tainted the prospective jurors. "A motion for a change of venire or venue is addressed to the sound discretion of the trial judge, and his action in overruling such a motion will not be reversed unless the record affirmatively shows that there has been an abuse of that discretion." *Coppola v. Commonwealth*, 220 Va. 243, 247, 257 S.E.2d 797, 801 (1979), *cert. denied*, 444 U.S. 1103 (1980) (citations omitted).

> The law presumes that . . . [an accused] can receive a fair trial from the citizens of the county or city in which the offense was committed and to overcome this presumption the defendant must clearly show that there is such a widespread feeling of prejudice on the part of the citizenry as will be reasonably certain to prevent a fair and impartial trial.

*Id*. at 248, 257 S.E.2d at 801.

■ Ascher has not overcome the presumption that she received a fair trial in Loudoun County. Ascher introduced numerous news articles and editorials regarding the LaRouche organization and

the prosecutions related to it. However, the existence of extensive pretrial publicity is insufficient, standing alone, to justify a change of venue. *Tuggle v. Commonwealth*, 228 Va. 493, 503, 323 S.E.2d 539, 545 (1984), *vacated on other grounds*, 471 U.S. 1096 (1985). Ascher did not clearly show that a widespread feeling of prejudice existed among the veniremen so as to prevent the possibility of a fair and impartial trial. Of the nearly eighty articles introduced into evidence, only six mention her by name. Prospective jurors are not required or expected to be completely ignorant of the facts and the issues surrounding a highly publicized case; all that is required is that a prospective juror can lay aside his or her impression or opinion and render a verdict based upon the law and evidence. *Irvin v. Dowd*, 366 U.S. 717, 723 (1961). An accused must show that publicity so influenced the citizenry that a jury could not be seated free from bias created by the publicity. *Id.* Ascher failed to make any such showing. When questioned on *voir dire*, each juror who was seated in Ascher's case assured the court that he or she could perform as expected.

■ The trial court's decision to attempt to seat a jury before ruling on Ascher's motion to change venue was a proper exercise of discretion. "A court may refuse to summon a jury from another county until an ineffectual effort has been made to obtain an impartial jury from the county in which the trial is to take place." *Coppola*, 220 Va. at 248, 257 S.E.2d at 801 (citations omitted). The fact that an impartial jury was seated from Loudoun County raises a conclusive presumption that the motion for a change of venue was unfounded. *Webb v. Commonwealth*, 154 Va. 866, 872, 152 S.E. 366, 368 (1930); *Muscoe v. Commonwealth*, 87 Va. 460, 461, 12 S.E. 790, 791 (1891). We find nothing in the record to cause us to find otherwise. *See Justus v. Commonwealth*, 220 Va. 971, 977, 266 S.E.2d 87, 91 (1980).

*Juror Bias*

■ Ascher contends the trial court seated jurors who were not qualified to serve because they were biased against her. She argues they were disqualified because they held preconceived opinions of her guilt based upon newspaper accounts. The record does not support Ascher's contention. The mere existence of a preconceived notion as to guilt or innocence of an accused arrived at from news articles or reports is not sufficient to establish that a juror is disqualified unless the juror cannot disregard those reports

and set aside his or her notion and base his or her verdict upon the evidence presented in the case. *Washington v. Commonwealth*, 228 Va. 535, 544, 323 S.E.2d 577, 584 (1984), *cert. denied*, 471 U.S. 1111 (1985).

■ The record shows that the members of the venire were carefully and extensively questioned for several days by the court, by the Commonwealth's attorney, and particularly by defense counsel. The court allowed counsel to "voir dire" the jurors in pairs in order to permit more careful scrutiny. While virtually every venire member had been exposed to some pretrial publicity, the jurors who were seated on the panel were firm in their belief that they could be impartial and could render a verdict based solely on the evidence presented at trial. While some of the jury members had unfavorable opinions about LaRouche and his organization, they had no preconceived notion about Ascher's guilt or innocence and understood that Ascher was presumed innocent until the evidence established her guilt beyond a reasonable doubt. Pretrial exposure to media coverage does not disqualify a juror who can decide a case solely from the evidence presented. *Briley v. Commonwealth*, 221 Va. 563, 570, 273 S.E.2d 57, 61 (1980).

■ Even if some of the *voir dire* questions by the trial judge might be considered leading, the trial court did not coerce or persuade the jurors to acquiesce in a particular viewpoint. Rather, the questions permitted the jurors to answer questions which reflected their qualifications for impartial jury service and the point of view expressed emanated from the jurors themselves. *See Educational Books, Inc. v. Commonwealth*, 3 Va. App. 384, 389, 349 S.E.2d 903, 907 (1986). "[U]nder our system it is [the trial] judge who is best situated to determine competency to serve impartially." *Patton v. Yount*, 467 U.S. 1025, 1039 (1984). The trial judge had the ability to evaluate the weight and credibility of the responses.

> [T]he trial court must weigh the meaning of the answers given in light of the phrasing of the questions posed, the inflections, tone, and tenor of the dialogue, and the general demeanor of the prospective juror. We are aware that, while the words employed may, when transcribed and read in retrospect, appear ambivalent, the judge who heard them ut-

tered was uniquely positioned to assess their ultimate import.

*LeVasseur v. Commonwealth*, 225 Va. 564, 584, 304 S.E.2d 644, 655 (1983), *cert. denied*, 464 U.S. 1063 (1984). Because the trial judge is "uniquely positioned," his or her "decision in these matters will not be overturned 'unless we can say . . . that it was erroneous.'" *Id.* The record supports the ruling of the trial judge that the jurors were not biased. Accordingly, we hold the trial judge seated a jury free from exception.

## II. EVIDENTIARY ISSUES

*Right of Confrontation*

Ascher argues she was denied her sixth amendment right to confront her accusers as to the three counts alleging that she knowingly and willfully offered or sold securities in violation of Code § 13.1-504 to Mary Cathleene Waddell. When Waddell was called to testify, she was suffering from a speech impediment and a partial loss of memory as the result of a stroke which occurred after her dealings with Ascher. Ascher argues that Waddell's memory was so impaired that she was functionally unavailable for cross-examination which, in effect, violated her right to confront this witness. Ascher contends the counts involving Mary Cathleene Waddell, therefore, should be dismissed. We disagree.

In *Delaware v. Fensterer*, 474 U.S. 15 (1985), the United States Supreme Court stated:

> The Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony marred by forgetfulness, confusion or evasion. To the contrary, the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinders the reasons for giving scant weight to the witness' testimony.

*Id.* at 21-22. Recently, the Court stated: "[t]he Confrontation Clause guarantees only 'an *opportunity*' for effective cross-examination . . . . It is sufficient that the defendant has the opportunity to bring out such matters as . . . lack of care and attentiveness . . . and even . . . the very fact that he has a bad memory." *United States v. Owens*, 484 U.S. 554, 559 (1988) (emphasis in

original) (citations omitted).

Our review of Waddell's testimony reveals that Ascher was provided the opportunity to extensively cross-examine Waddell. The questions posed by defense counsel often addressed Waddell's ability to remember. Substantively, Waddell's testimony reveals that she kept fairly detailed and extensive records of her financial dealings with Ascher and with others associated with the LaRouche organization; her documents were made exhibits without objection and were appropriately referred to by Waddell to refresh her memory at trial. Many of the checks she had written, which totalled approximately $15,000, were specifically designated by her as loans. Waddell had promissory notes from the NCLC which corresponded to the checks she had written. Waddell testified that some of the money she had paid to the organization was, in fact, a contribution, although she was not able to identify the exact amount which was a gift. She was, nevertheless, unequivocal in stating that most of the money was a loan she expected to be repaid. She testified that her purpose of loaning the money to the organization was not political, but was to make an investment with a good rate of return.

Counsel for Ascher, through adroit cross-examination, successfully emphasized the weaknesses in Waddell's testimony and thereby gave the jury the opportunity to evaluate Waddell's credibility. Ascher had the opportunity, and did, in fact, confront the witnesses against her as to the counts involving Mary Cathleene Waddell. The trial court did not err by refusing to dismiss those counts in the indictment.

*Admission of Letters of Deceased Lender*

Ascher next assigns as error the trial court's ruling to admit into evidence letters of M. M. Brantley, who was deceased at the time of trial. Brantley had loaned over $91,000 to Campaigner Publications, Inc. in April and May of 1984 at an interest rate of twelve percent. Ascher solicited these loans from Brantley. The transaction with Brantley was not the basis of any of the indictments against Ascher. The trial court admitted Brantley's letters to prove that Ascher and her co-conspirators knew of repayment problems when they continued to solicit loans. In Brantley's letters, he claimed he was facing financial ruin and pleaded for the repayment of his money. Ascher claims the prejudice of those let-

ters outweighed their probative value because the jury could have reasonably inferred that Brantley died as a result of his asserted desperate condition.

Brantley's letters were seized from the National Center Finance Office from a file created for correspondence from him. The promissory notes to Brantley which were also admitted into evidence had been signed by Ascher. Carol Leonard, Brantley's former personal secretary, was familiar with his signature and identified the letters which she had typed and others as having been drafted and signed by Brantley. Leonard also testified that she was a party to a three-way telephone conversation with Ascher in which Brantley demanded repayment of his $91,000 in loans which he had invested because of the higher rate of return. Brantley's letters showed that repayment of his notes for $91,000 were from four to eight months overdue and that he had received only two payments of $100 and $2,000.

The trial court, in admitting letters which were not addressed directly to Ascher but rather to Donald Phau or Campaigner Publications, Inc., expressly relied on other evidence that when complaints were received in the Finance Office, the practice was to notify the person who solicited the loan, either by sending a copy of the letter or by oral communication. In Brantley's case, that was Ascher. Also, Brantley's name appeared on the weekly budget memos of William Hintz, which Hintz testified he routinely discussed with Ascher. Since the letters were admitted, not to prove the truth or falsity of their content but to show that Ascher had notice of repayment problems and complaints when she continued to solicit other loans, the letters were not hearsay. *See Fuller v. Commonwealth*, 201 Va. 724, 729, 113 S.E.2d 667, 670-71 (1960). Knowledge by Ascher that loans were not being repaid was a factor which the jury could consider in determining whether she had the *animus furandi* to make her actions criminal. The letters proved that the loans were being solicited with no intention of repayment or with the intent to defraud the investor of his or her funds and that untrue statements of material facts were employed to obtain the money. The evidence was admissible to prove Ascher's motive or criminal intent.

Furthermore, the Brantley letters and related testimony concerning the involvement of Ascher, Donald Phau, and William Hintz tended to prove the conspiracy charge. That evidence

showed a scheme or agreement between Ascher and her confederates to defraud the investors and established that they had the requisite criminal intent. The letters were relevant. Their probative value outweighed any claim of prejudice.

Alternatively, Ascher argues that, if the portions of Brantley's letters which showed him to be in desperate financial straits had been redacted, the remaining portion of the letters would have served equally well to prove that Ascher had notice that loans were not being repaid. We disagree. Brantley's financial condition was relevant to the issue of notice and was crucial to fully understand Ascher's intent. That evidence made clear to the fact finder that Ascher understood and intended the consequences of her actions. Furthermore, those portions of Brantley's letters were inseparable from the text and would have considerably altered the nature of the notice which Ascher and others received.

Where evidence has little or no probative value and has the potential for being very prejudicial, such as showing unrelated crimes, it is error for the trial court not to redact the prejudicial evidence, unless the evidence is inextricably connected to the other evidence or to do so would mislead the fact finder. *Pierce v. Commonwealth*, 2 Va. App. 383, 391, 345 S.E.2d 1, 5 (1986). Where the "objectionable portion of the statement [could] easily be separated from the remainder of the admission without adverse effect," it is error for the trial court not to do so, and if the prejudice caused by admitting the evidence outweighs its probative value, the error will be reversible. *Id.*

However, such is not the case here. The evidence Ascher seeks to have excised was highly relevant because it showed that Ascher and others in the LaRouche organization with whom she allegedly conspired knowingly and willfully continued to solicit money knowing that they were not able to repay the loans.

Accordingly, the trial court did not err by admitting Brantley's letters in the form presented.

## III. JURY INSTRUCTIONS

*Definition of a Security*

Ascher claims the instruction to the jury attempting to define a security was inadequate. She argues the instruction provided the

jury with no understanding of the law sufficient for the jury to decide whether the promissory notes given by Ascher or at her direction to the lenders were, in fact, securities. The jury instruction told the jury that all promissory notes are securities. Ascher argues that many promissory notes are, in fact, not securities. Ascher contends the court should have given the instruction which she offered, or one comparable, which would have told the jury when a promissory note is not a security in order that the jury could have determined whether the notes at issue fell in the category of a security.

■ "Securities" are often defined in various references by merely giving examples of the numerous instruments which are commonly known as securities. However, securities are "[e]vidences of obligations to pay money . . . instruments giving to their legal holders rights to money or other property; they are therefore instruments which have intrinsic value and are recognized and used as such in the regular channels of commerce." *Black's Law Dictionary* 1354 (6th ed. 1983). The jury instruction which the court gave defining a security as a note or other evidence of indebtedness was taken verbatim from the definition of a security contained in Code § 13.1-501 of the Virginia Securities Act.[4] Instruction 17 from the court provided:

> The term "security" means any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral trust certificate; preorganization certificate of subscription; transferable share; investment contract; voting-

---

[4] Code § 13.1-501 reads:

"SECURITY" means any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral trust certificate; preorganization certificate of subscription; transferable share; investment contract; voting-trust certificate; certificate of deposit for a security; oil, gas or other mineral lease, right or royalty, or any interest therein; or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. However, this definition shall not apply to any insurance policy, endowment policy, annuity contract, variable annuity contract or any contract or agreement in relation to and in consequence of any such policy or contract, issued by an insurance company subject to the supervision or control of the Commission's Bureau of Insurance when the form of such policy or contract has been duly filed with the Bureau as now or hereafter required by law.

trust certificate; certificate of deposit for a security; oil, gas or other mineral lease, right or royalty, or any interest therein; or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

The instruction was a correct statement of the law. However, the duty to properly instruct the jury is not always "discharged . . . by reading the applicable statute to the jury." *Dowdy v. Commonwealth*, 220 Va. 114, 116, 255 S.E.2d 506, 508 (1979) (citing *United States v. Harris*, 346 F.2d 182, 184 (4th Cir. 1965)).

■ The question which Ascher raises is whether the court erred by failing to provide the jury with a more complete definition which would provide them with the standard needed to determine whether the promissory notes were non-securities. We hold the instruction was adequate because, on these facts, there is no context in which the jury could have found the notes at issue not to have been securities within the proscriptions of Code §§ 13.1-520 and 13.1-501. Therefore, there were no facts to support the giving of Ascher's proffered instruction or a comparable instruction defining when a promissory note or evidence of indebtedness is not a security.

A reviewing court's responsibility in reviewing jury instructions is "to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.". . .[A] jury must be informed as to the essential elements of the offense; a correct statement of the law is one of the "essentials of a fair trial."

*Darnell v. Commonwealth*, 6 Va. App. 485, 488, 370 S.E.2d 717, 719 (1988) (citation omitted).

Ascher does not challenge that the trial court properly instructed the jury as to the elements of securities fraud. The gravamen of the offenses charged under Title 13.1 is the intent to knowingly and willfully violate the provisions of the statute as provided in Code § 13.1-520(A). *See* fn. 1, *supra*. The jury was required to determine, upon being presented with the appropriate definitions and elements, whether Ascher had the requisite intent to defraud.

Thus, if the definitional instruction of a security was adequate, the instructions allowed the jury to determine whether Ascher violated Code § 13.1-520(A).

In general terms, we agree with Ascher that the instruction given by the trial court, although a correct statement of the law, may in other circumstances have been insufficient to define when a commercial instrument is or is not a security. However, on the facts in this record, no elaborative instruction was necessary because there was no theory or basis which would have permitted the fact finder to conclude that the notes or evidence of indebtedness were not securities.

The Virginia Securities Act is, by design, very broad in its scope and coverage. "[F]ederal courts have construed broadly the disclosure and regulation requirements of the federal [Securities] Acts. As a corollary, they read narrowly the exemption provisions. . . . We believe Virginia's Act should receive similar construction." *Pollok v. Commonwealth*, 217 Va. 411, 413, 229 S.E.2d 858, 860 (1976) (citation omitted). *See Reves v. Ernst & Young*, 494 U.S. 56, 60 (1990) ("in defining the scope of the market that it wished to regulate, Congress painted with a broad brush"). In *Reves*, a unanimous Court acknowledged the well-recognized legislative intent to provide broad coverage for regulating securities and, based upon that intent, broadly defined "a note" as found in the definition of "security," terms common to both the federal and Virginia statutes.[5] The *Reves* Court established a three-step approach in determining when a note is a security, which analysis begins with a focus on the language of the statute: "[A] note is *presumed* to be a 'security.' " *Reves*, 494 U.S. at 67 (emphasis added). Similarly, we hold that under the Virginia Securities Act, a promissory note is presumed to be a security.

The presumption that a note is a security may be overcome by showing that the instrument does not have the characteristics or qualities of a security. "[T]hat presumption may be rebutted *only* by a showing that the note bears a *strong* resemblance . . . to one of the enumerated categories of instrument," which the Court declared were notes that did not have the character of a security. *Id.*, 494 U.S. at 67 (emphasis added). The *Reves* Court defined a

---

[5] *See* Code § 13.1-501, fn. 1, *supra*. For the virtually identical federal definition, see *Reves*, 494 U.S. at 60.

non-exclusive list of notes issued as part of commercial financing arrangements, which had been previously enumerated by the Second Circuit in *Exchange National Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1138 (2d Cir. 1976), and expanded by that Court in *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 939 (2d Cir.), *cert. denied*, 469 U.S. 884 (1984). Those notes, which are generally non-securities, include:

> the note delivered in consumer financing, the note secured by mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a "character" loan to a bank customer, short-term notes secured by an assignment of accounts receivable, a note which simply formalizes an open-account debt incurred in the ordinary course of business . . . and "notes evidencing loans by commercial banks for current operations."

*Reves*, 494 U.S. at 65 (citation omitted). The notes which Ascher offered or sold do not resemble any of the notes defined in *Reves* as not constituting a security.

"If an instrument [specifically a note] is not sufficiently similar to an item on the list, the decision whether another category should be added is to be made." *Reves*, 494 U.S. at 67. The Supreme Court identified in *Reves* four characteristics which are common to the specified notes that are not securities, and which should be considered in determining whether other notes are non-securities. Thus, if a promissory note does not resemble any of those commonly recognized commercial instruments which are not considered securities, the court must consider and decide whether the note may fall within a broader definition of a promissory note that is not a security.

The first factor is "the motivations" which would influence the buyer's and seller's decision in entering into the transaction. If the seller is raising operational funds for an enterprise and the buyer is interested in profit,[6] the instrument is most likely to be a "security." *Reves*, 494 U.S. at 66. The second factor is the "plan of distribution" set up for the notes. *Id.* Offering notes to a "broad

---

[6] The Court emphasized "that by 'profit' in the context of notes we mean 'a valuable return on an investment,' which undoubtedly includes interest." *Reves*, 494 U.S. at 68 n.4.

segment of the public" is all that is necessary to establish the "requisite 'common trading' " to qualify the note as a security. *Id.* at 68. The third factor is the "reasonable expectations of the investing public." *Id.* at 66. Where the public reasonably perceives the instrument to be an investment, this factor *alone* qualifies it as a security even when an economic analysis of those circumstances unique to a transaction would suggest that the note is not a security. *Id.* The fourth factor is whether there exists some other "regulatory scheme" applicable to the transaction or instrument which would "significantly" reduce the risk to the buyer or to the public of such an investment if the securities act did not control. Examples of such regulatory schemes include the federal deposit insurance corporation and federal banking laws. *Id.* at 67, 69.

The facts in the *Reves* case are sufficiently similar to those here to be instructive. Ernst & Young made no claim that the promissory notes which had been issued by a farmer's cooperative to raise general operations funds bore a family resemblance to any of the enumerated categories of notes which are considered non-securities. Neither does Ascher. In *Reves*, the Supreme Court had to determine whether there had been a sufficient showing that the notes failed to meet the criteria for those notes which are considered securities so that they could be classified as non-securities.[7]

Applying the "motivations" criterion, the Court in *Reves* observed that the notes were issued "in an effort to raise capital for its general business operations, and purchasers bought them in order to earn a profit in the form of interest." *Id.* at 67-68. The same is true with all the notes issued by Ascher. Ms. Waddell's notes (counts seven through nine) were for eight percent and six percent interest per annum. She testified that this rate of return was greater than that which she was making and a significant factor in her investment decision. The notes sold to Dr. Allen (count eleven) paid interest ranging as high as twelve percent to fifteen percent per annum. Some of the notes he purchased with money from his self-directed pension fund were required by law to be investments from which he would realize a profit. The notes which Ascher and her confederates issued to Robert Ware (count four)

---

[7] Since formulating this test in 1976, the Second Circuit has added to its list of notes which do not resemble securities only once, in *Chemical Bank v. Arthur Anderson & Co.*, 726 F.2d 930 (2d Cir.), *cert. denied*, 469 U.S. 884 (1984).

paid commercially competitive interest rates, which he testified was a factor in his investment decision. Ascher told Larry Burchett (count ten) that the corporations paid prevailing interest rates on the promissory notes. In her recorded sales presentation to Mr. Burchett, Ascher consistently referred to the operational use of the loan proceeds. There came a time in late 1985 when a ceiling was established, whereby no more than forty percent of the operational expenses of the organization could come from loans. Prior to that, sixty percent of the operational expenses were paid with the proceeds from the sale of notes. Thus, the evidence shows that all the lenders were investing with an expectation of a return of principal and interest, and the organization was using this method to generate operational capital.

As to the "plan of distribution" factor, the Court in *Reves* observed that notes were offered to non-members as well as members of the issuing co-operative. The fact that the notes were not sold or offered for sale on an open exchange was not the controlling factor. The significant fact was that the notes were offered for sale to a "broad segment of the public." *Reves*, 494 U.S. at 68. The distribution scheme here involves a much broader segment of the public than did the plan in *Reves*. By March 1985, Ascher and her organization had marketed more than $10 million in promissory notes to over 2,000 people throughout the United States. By December 1985, the amount of money raised by loans had grown to $30 million.

Regarding the "public perception" factor, in *Reves* the co-operative characterized the notes as investments and stressed that they were "safe" and "secure." *Id.* at 59. "In these circumstances, it would be reasonable for a prospective purchaser to take the Co-Op at its word." *Id.* at 69. Here again, Ascher sold the notes as "investments," and safety and a history of repayment was consistently stressed by her and relied upon by the investors.

As to whether the notes were subject to "alternative methods of regulation," the Court in *Reves* observed: "Finally, we find no risk-reducing factor to suggest that these instruments are not in fact securities. The notes are uncollateralized and uninsured. Moreover . . . the notes here would escape federal regulation entirely if the Acts were held not to apply." *Id.* That description of the promissory notes also applies to the notes which Ascher issued on behalf of NCLC. But for the regulatory scheme imposed by

the Virginia Securities Act through the State Corporation Commission, there would be "no risk reducing factor" or "substantial regulation" of these notes, which were being aggressively marketed to investors nationwide by phone and personal contact.

In sum, no evidence exists from which a fact finder could reasonably have found that Ascher overcame the presumption that the notes at issue were securities. Having not presented any evidence to overcome that *prima facie* presumption, she was not entitled to an instruction to the jury, other than the one given by the trial court, which would have permitted the jury to have found the notes resembled any of the instruments not common to a security.

*Concert of Action*

Ascher's final assignment of error is that the trial court incorrectly granted a concert of action instruction, which stated:

> If there is concert of action with the resulting crime one of its incidental probable consequences, then whether such crime was originally contemplated or not, all who participate in any way in bringing it about are equally answerable and bound by the acts of every other person connected with the consummation of the resulting crime.

Ascher's contention is that the instruction abrogates the necessity that the Commonwealth prove that she agreed with others to commit an illegal act. In other words, Ascher argues, based on this instruction, the jury was allowed to find her guilty of a conspiracy without also having to find that she had agreed to sell or offer for sale notes in violation of the Virginia Securities Act.

It is not necessary that we rule on the merits of this argument because the evidence is that Ascher and others agreed to issue notes to lenders in exchange for money loaned to various organizations. No factual controversy existed that Ascher and others agreed to perform these acts in concert with one another. Ascher does not challenge that she agreed with others to issue on behalf of NCLC promissory notes in exchange for money loaned. She admits that was the purpose and function of her fund-raising efforts, and she and others undertook and agreed to do so. All of the testimony and exhibits presented at trial establish that Ascher did act in agreement with her confederates.

She contended at trial that her agreement was not a conspiracy because it was not an agreement to do an illegal act in violation of Code § 13.1-502. She argued that the notes were not securities and, even if they were, she and the others did not intend or employ a scheme to defraud or obtain money by means of any untrue statement of a material fact or engage in a transaction or course of business which operates as a fraud in violation of Code § 13.1-502. As previously noted, Ascher's acts in continuing to solicit loans knowing that the obligations could not be repaid and misrepresenting the repayment history, among other factors, were sufficient to prove a conspiratorial intent or scheme to defraud others.

Assuming that the concert of action instruction should not have been given, which we do not hold, it did not relieve the Commonwealth of proving that Ascher agreed with others to commit acts which were criminal. The jury was clearly told in Instruction 32 that the Commonwealth had to prove beyond a reasonable doubt that Ascher agreed with others to offer or sell a security with the intent to defraud the purchasers. The three conspiracy instructions granted were clear and unequivocal in requiring that the jurors find that Ascher was part of an agreement.[8] The concert of action

---

[8] The Conspiracy instructions were as follows:

INSTRUCTION NO 32:

Defendant has been charged with the crime of conspiracy to offer or sell a security with the intent to defraud the purchaser.

The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime:

(1) that the defendant entered into an agreement with one or more other persons; and

(2) that the agreement between the defendant and at least one other person was that they were to unlawfully offer or sell a security with the intent to defraud the purchaser of such security; and

(3) that such agreement continued during some period between August 18, 1985 and March 30, 1987; and

(4) that the agreement was made, in whole or in part, or an act in furtherance of this agreement took place in whole or in part in Loudoun County, Virginia.

If you find from the evidence that the Commonwealth has proven beyond a reasonable doubt each of the elements of the offense as charged, then you shall find the defendant guilty and fix her punishment at a specific term of imprisonment, but not less than one (1) year nor more than ten (10) years; or confinement in jail for a specific time of not more than twelve (12) months and/or a fine of a specific amount, but not more than $1000.

If you find that the Commonwealth has failed to prove beyond a reasonable doubt any one or more of the elements of the offense, then you shall find the defendant not guilty.

instruction, like Instruction 33, was then given to address the *liability* of the conspirators if the jury found a conspiracy existed. It allowed the jury to find Ascher criminally liable for the conduct of her cohorts "connected with the consummation of the resulting crime," which were the same acts as those committed "in furtherance of the conspiracy." Because the jurors were required to find an agreement before determining Ascher's liability, we conclude there was no error.

## IV. CONCLUSION

Because we find no error in the judgment of the trial court, we conclude that Ascher received a fair trial by an impartial jury in the Circuit Court of Loudoun County. Her convictions are, accordingly, affirmed.

*Affirmed.*

Keenan, J.,* and Moon, J., concurred.

---

INSTRUCTION NO. 33:

If you find that the Commonwealth has established beyond a reasonable doubt that the defendant was a member of a conspiracy, she is responsible for the acts of other members of that conspiracy which are committed in furtherance of the conspiracy, even if such acts are committed without her direct knowledge.

INSTRUCTION NO. 34:

A conspiracy cannot exist unless criminal intent is shared by the minds of at least two people.

* Justice Keenan participated in the hearing and decision of this case prior to her investiture as a Justice of the Supreme Court of Virginia.